[19 NYS3d 228]

In the Matter of ELIHU KOVER, Respondent, for the Appointment of a Guardian of the Person and Property of EVA DWORECKI, an Alleged Incapacitated Person. BURTON CITAK et al., Nonparty Appellants.

First Department, October 27, 2015

65

### APPEARANCES OF COUNSEL

*Law Office of Peter Wessel, PLLC*, New York City (*Peter Wessel* of counsel), for appellants.

*Law Offices of Annette G. Hasapidis*, Mt. Kisco (*Annette G. Hasapidis* of counsel), for respondent.

### OPINION OF THE COURT

ANDRIAS, J.

The nonparty appellants, Burton Citak and Donald L. Citak, by their firm Citak & Citak, represented Dr. Eva Dworecki, the alleged incapacitated person (AIP), in this guardianship proceeding. In this appeal, there are two primary issues before us.

The first is whether the court abused its discretion when it imposed monetary sanctions and/or costs pursuant to the Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1 upon Burton and/or Donald based on their conduct in connection with their applications seeking, inter alia, to bar the entry of the coguardianship order and to dismiss the petition. For the reasons that follow, we find that Donald, but not Burton, engaged in frivolous conduct within the meaning of section 130-1.1, and that the imposition of sanctions and costs against Donald was not an abuse of discretion. However, as to the amount and scope of the costs, we vacate the award and remand for compliance with 22 NYCRR 130-1.2 in accordance with this decision.

The second issue is whether the court erred in denying Citak & Citak any attorney's fees. We find that the denial of all fees is not warranted and that Citak & Citak is entitled to the reasonable fees for the work performed prior to Donald's sanctionable conduct.

Although it is a primary focal point of the dissent, which believes that neither Citak should be sanctioned for his "missteps" and that the court below is to blame for everything that transpired, the issue of whether the court erred in entering the coguardianship order, without either confirming the consent of Dr. Dworecki or conducting a capacity hearing, is not before us. Indeed, the attorney who replaced Citak & Citak as counsel for Dr. Dworecki represented to the court at the sanctions hearing that she discussed the temporary coguardianship at length with Dr. Dworecki and "was very confident . . . that she had no desire to appeal." Nor, under the particular circumstances of this case, where Donald initiated, participated in and consented on behalf of Dr. Dworecki to the procedure adopted by the court, then denied his role and falsely accused the court of wrongdoing and fraud, would any such error, in and of itself, excuse the sanctionable conduct at issue, including Donald's material false statements in support of his applications.

Pursuant to article 81 of the Mental Hygiene Law, in July 2012 petitioner, as vice-president of Nazi Victim Services Program of Selfhelp Community Services, Inc. (Self Help), sought to have a guardian appointed for the person and property of Dr. Dworecki, age 94. Self Help had been providing community based services to Dr. Dworecki since 2002 and was concerned that her short term memory, judgment, and ability to perform the activities of daily living had been declining and that she was refusing to obtain necessary additional home care services. This included Dr. Dworecki's inability to cook, clean her apartment and person, and manage her medications by herself.

Dr. Dworecki's friend and financial advisor, Edward Muster, procured Citak & Citak to represent her in opposing the petition. Mr. Muster is the primary beneficiary under Dr. Dworecki's last will and testament, executed on August 11, 2010. Although Mr. Muster claims that he was not present when the will was executed, he states in an affidavit that "[p]rior to the preparation of the Will, [Dr. Dworecki] told me what she wanted included in the Will. As on other occasions, I followed [her] instructions." Thus, it appears that he was responsible for its preparation. The Citaks also acknowledge that on August 7, 2012, after being retained to defend this proceeding, they prepared, and filed in the Surrogate's Court, a new will for Dr. Dworecki which did not materially change the terms of the 2010 will.

Mr. Muster is also Dr. Dworecki's attorney-in-fact under a power of attorney executed on March 20, 2012. At the commencement of this proceeding, the court restrained him from using the power of attorney until the hearing of the application, and appointed Matthew Milford, Esq., as the neutral Court Evaluator to report on Dr. Dworecki's condition. During the four-month period between the execution of the power of attorney and the issuance of the stay, Mr. Muster had not used his authority under the instrument to obtain any of the additional personal and home care services that Dr. Dworecki needed to address the issues that Self Help had identified.

In his report dated August 7, 2012, the Evaluator stated that Dr. Dworecki seemed confused when he told her that Burton was her attorney. Noting that Mr. Muster had procured Burton, the Evaluator stated that the "nature of this apparent conflict of interest is unclear to the Affirmant."

Although the Evaluator believed that Mr. Muster competently managed Dr. Dworecki's assets, he opined that Mr. Muster "has not been able to provide for her personal needs satisfactorily up [to] the present moment. Thus, pursuant to the Affirmant's recommendation, it may be necessary to appoint a guardian of the person and property of Dr. Dworecki." The Evaluator noted that Dr. Dworecki had a number of health issues that compromised her ability to handle her affairs of daily living satisfactorily, including irreversible functional deficits. While Dr. Dworecki believed that she had more ability to manage activities of daily living than she in fact did, that false belief was based in large part on her extreme frugality. In that regard, the Evaluator noted that Dr. Dworecki "may not fully understand the extent of her wealth and the ease with which she could provide herself with all the assistance she clearly requires."

Despite these findings, the Evaluator suggested that the court consider the sufficiency and reliability of alternative resources to provide for Dr. Dworecki's needs without the appointment of a guardian. Towards this end, the Evaluator recommended that the court reinstate Mr. Muster's power of attorney and adjourn the case to provide him with a short period of time to get Dr. Dworecki the additional personal and home care services she needed. However, the Evaluator also stated that "[i]f the Court finds it necessary to appoint a Guardian for the Person and/or Property, the Guardian should be appointed for an indefinite period of time. The powers outlined in [the] Petition should be granted."

At an August 9, 2012 court conference, Dr. Dworecki appeared, represented by Burton. Mr. Muster and the Evaluator were also present. After conferring with the attorneys and the Evaluator, the court told Dr. Dworecki that they had been discussing whether something could be put in place that would enable her "to have all of the services that you need so that we're sure that you are safe and you are not at risk in any way and that your are comfortable without having a guardian necessarily appointed for you." The court explained that in furtherance of that goal, the attorneys had agreed that an interim special guardian should be appointed by the court for a trial period during which the extent of her needs would be assessed, and that this had to be done by a neutral, rather than an interested party. Dr. Dworecki acknowledged her need for assistance and agreed with the court that a trial period to ensure that she received the necessary services right away, and to evaluate her needs, "ma[de] sense."

The court next informed Dr. Dworecki that Mr. Muster could continue to help with her fixed expenses, such as rent and telephone, but that the new special services would be implemented by the interim special guardian, and that Dr. Dworecki would have to pay for those services. In open court, Burton reiterated to Dr. Dworecki that she had to pay for the new services and that the purpose of the trial period was to assess the extent of the services needed, after which a decision would be made as to which services were worthwhile. The court then adjourned the matter for several months during which the alternative resources provided to Dr. Dworecki would be monitored to determine whether there was a need for a permanent guardian.

To effectuate the plan, by order dated August 10, 2012, the court, based on Dr. Dworecki's acknowledgment of her need for assistance and consent, appointed Sabrina Morrissey, Esq., as the interim special guardian for the trial period. The court also revoked any power of attorney or health care proxy previously executed by Dr. Dworecki and, as agreed, permitted Mr. Muster to continue to assist Dr. Dworecki in paying her monthly bills.

In four reports over the next five months, Ms. Morrissey outlined the services that she put in place for Dr. Dworecki. In addition to hiring home health aides, Ms. Morrissey obtained Dr. Dworecki's consent to cataract surgery, which Mr. Muster had been unable to obtain, which restored her ability to read. Ms. Morrissey also obtained Dr. Dworecki's cooperation for

new personal and home care services, including physical therapy, which improved Dr. Dworecki's ambulation, as well as regular visiting nurse services, dental care, additional meal delivery and house cleaning. She also improved Dr. Dworecki's social interaction by retaining service providers who spoke German and Spanish, which Dr. Dworecki spoke and wanted to practice, and by arranging for holiday dinners and celebrations. Based on the vast improvement that these services had made in the quality of Dr. Dworecki's life, Ms. Morrissey believed that a permanent guardian was needed to ensure that the services would continue.

At a January 16, 2013 status conference, at which Dr. Dworecki's appearance was waived due to severely inclement weather, Donald advised the court that he wanted, on behalf of Dr. Dworecki, to avoid a competency hearing, which would be a difficult case for his client in terms of avoiding a finding of incapacity. While stating that at times Dr. Dworecki expressed her objection to a permanent guardianship, Donald advised the court, inter alia, that "if Mr. Muster and Ms. Morrissey, together, given the relationship that has developed, were indicated to be the joint temporary guardians, [Dr. Dworecki] would consent to that arrangement."

In the extensive discussion on the record that followed, the court, which had the opportunity to observe and converse with Dr. Dworecki at the prior conference, set forth a well-modulated and nuanced structure for the temporary coguardianship, including the respective roles of Ms. Morrissey and Mr. Muster. The court then asked that the attorney for petitioner "settle [a] final order and judgment"[1] and stated that "this would also be an adjudication of a person in need of a guardian, since it's on consent and we have not had a full hearing with an adjudication of incapacity." The Citaks, who readily acknowledged the benefits Dr. Dworecki was reaping from the new services being provided, did not object to the parameters for the temporary coguardianship set forth by the court, including the limitation of Mr. Muster's powers, or otherwise indicate that a competency hearing, which they stated that they and Dr. Dworecki wanted to avoid, was required.

By order dated January 30, 2013, the court directed that the interim special guardian settle a final order and judgment on

---

1. At the end of the hearing, it was agreed that the interim special guardian would draft the order instead.

notice consistent with its directives, which were set forth in the order, and based on "the reports of the special guardian and Dr. Dworecki's continued acknowledgment of her need for assistance and her consent to a temporary guardianship, as confirmed by her attorneys." Citak & Citak took no action at that time to dispute Dr. Dworecki's consent or to contest the court's directives, and on February 15, 2013 submitted an affirmation of services in which Burton stated, "We are continuing to work with the Court and Ms. Morrissey to craft a fair and limited Final Order, which provides for the assistance needed by Dr. Dworecki, while preserving and safeguarding her independence and self-dignity."

In March 2013, the interim special guardian submitted a proposed order and judgment on notice to all parties. Citak & Citak did not submit a counter order and judgment. Instead, the firm submitted an order to show cause upon the affirmation of Donald (motion seq. No. 2), which sought to (i) stay the entry of any order appointing a guardian for Dr. Dworecki; and (ii) schedule an evidentiary hearing to determine Dr. Dworecki's need for a guardian.

Donald now asserted that Dr. Dworecki had not consented to the appointment of a guardian and that the court "appears to have completely ignored Dr. Dworecki's wishes and appears ready to run completely roughshod over them and her rights." Donald alternatively asserted that any consent that purportedly was given on Dr. Dworecki's behalf was predicated on Mr. Muster being appointed as coguardian to manage her financial affairs without limitation, and that the court had wrongfully denied Dr. Dworecki her right to a full hearing and finding of incapacity.

Donald also accused the court of intervening in an "unwarranted, unrestricted and heavy-handed manner," and asserted that "[t]he attempt to hide, misconstrue or conceal facts from Dr. Dworecki is problematic and any attempt to do so is simply an injustice to Dr. Dworecki and deprives her of her rights and dignity." In a supporting affidavit, Dr. Dworecki stated that

> "[t]hrough my attorneys, I did indicate, that if the Court felt that a Guardian was absolutely necessary to assist me in certain limited personal aspects of my life (such as assisting me in the morning and in the evening with dressing, bathing, or preparing a meal), I would only consent under such circumstances that my dear friend, Edward Muster, whom

I regard as my son, was appointed as my Co-Guardian."

At a March 11, 2013 hearing addressing the request for a temporary restraining order contained in the order to show cause, Donald maintained that he had not consented to the appointment of a guardian on Dr. Dworecki's behalf and that he had in fact objected to that. After reviewing the poor state of Dr. Dworecki's health and living conditions prior to the guardianship, and all of the services that she was now receiving, which resulted in significant improvements to her health, happiness and quality of life, the court admonished Donald, stating that

> "if you feel that the circumstances have so changed that she no longer needs a guardian, then that's one way to approach your application. But approaching your application by condemning everything that happened here and Ms. Morrissey and the person in need of a guardian adjudication for which you participated in and to which you consented is not acceptable to me."

The court nevertheless signed the order to show cause with the temporary restraining order, stating that a guardianship hearing would be held.

By order to show cause signed on April 12, 2013, petitioner moved to remove Citak & Citak as Dr. Dworecki's attorneys

> "because of a conflict of interest in their representation of the Doctor, their unfamiliarity with Article 81 Law, their frivolous and untrue allegations against the Petitioner, their unethical behavior toward the Doctor and other interested parties herein that may border on malpractice, and a general lack of professional courtesy—both toward their alleged 'client' and toward other attorneys on this case, and the Court, by asserting frivolous and untrue information and allegations."

Petitioner questioned whether the Citaks were acting to protect Dr. Dworecki's interests or Mr. Muster's, and asked the court to appoint and authorize new counsel to, inter alia, determine whether proceedings are necessary to void the 2010 will naming Mr. Muster as Dr. Dworecki's primary beneficiary. Petitioner also requested that the court deny legal fees to Citak & Citak or substantially reduce their fee request.

On April 16, 2013, Citak & Citak presented another order to show cause (motion seq. No. 4), which sought various relief, including dismissing the petition due to alleged violations of Dr. Dworecki's rights and the recusal of Justice Visitacion-Lewis. Donald submitted a 46-page affirmation in support, enumerating the ways in which those rights had allegedly been violated. This included an allegation of purported intentional and deliberate efforts by the court, the interim special guardian, and social workers to mislead and deceive Dr. Dworecki by failing to disclose the truth of the proceedings, "including . . . the costs being unilaterally imposed upon her for the Guardian and the services being provided by the Guardian to Dr. Dworecki." The court declined to sign the order to show cause.

Meanwhile, Mr. Muster retained his own counsel and opposed the dismissal of Citak & Citak as Dr. Dworecki's counsel. From his affidavit, Mr. Muster's concern with preserving his control over Dr. Dworecki's assets and his status as the residuary beneficiary of her estate is apparent. Mr. Muster complained that, contrary to Dr. Dworecki's wishes, Ms. Morrissey had made efforts to transfer Dr. Dworecki's assets from his employer to another firm, thereby insuring that he would no longer be able to manage her portfolio. In this regard, Mr. Muster asserted that Dr. Dworecki's "consent to the appointment of a guardian was conditioned upon the Court appointing [him] as Co-Guardian of the Property" without limitation. Mr. Muster also stated that his attorney had informed him that Mental Hygiene Law § 81.29 (d) precluded the court from invalidating Dr. Dworecki's will, and asked that the court conduct a hearing to consider alternative resources available to Dr. Dworecki and the least restrictive form of intervention. Mr. Muster's counsel submitted an affirmation asserting that the alternative resources available to Dr. Dworecki, primarily Mr. Muster's power of attorney, had been ignored by petitioner and the court, and that the court had made a number of rulings that had violated Dr. Dworecki's rights.

By affidavit sworn to April 19, 2013, Ms. Morrissey opposed Citak & Citak's motion to stay the entry of a guardianship order, stating that the transcript of the January 16, 2013 conference confirmed that the Citaks had consented to the guardianship provided that it was labeled temporary and Mr. Muster was appointed coguardian. Emphasizing that the Citaks voiced no objections to the terms of the coguardianship set forth by the court and did not request that Mr. Muster be

given any additional powers, she theorized that things had changed when Mr. Muster realized that he would no longer be managing Dr. Dworecki's $2 million account. Ms. Morrissey also stated that the allegations in Dr. Dworecki's affidavit complaining that the guardianship was robbing her of her independence and stripping her of her rights had never been made to her by Dr. Dworecki, who seemed to enjoy her aides, therapy and renewed social interactions.

Ms. Morrissey also addressed the motion to relieve Citak & Citak, voicing her concern over whether Dr. Dworecki was

> "capable of retaining and managing her own attorneys, which was highlighted through the expressed wishes of Dr. Dworecki not to meet with the Citaks, particularly Burton Citak, Esq., alone and at night, and the upsetment [sic] caused by Burton Citak, Esq. when he met with Dr. Dworecki to discuss the guardianship proceeding."

Lastly, Ms. Morrissey expressed her concern that the Citak's revised course of action would result in Dr. Dworecki being found an incapacitated person, rather than a person in need, and that the label would be hurtful to her.

By order dated April 30, 2013, the court found Citak & Citak's filings in motion seq. Nos. 2 and 4 to be frivolous under 22 NYCRR 130-1.1 (c), and directed a hearing to accord the Citaks and any interested parties an opportunity to be heard with respect to the imposition of costs and/or sanctions. The court vacated the temporary restraining order granted on March 11, 2013, denied the application to stay entry of an order appointing coguardians (motion seq. No. 2), and signed the proposed order and judgment implementing a temporary five-year coguardianship.

The court held in abeyance, pending the resolution of the sanctions issue, petitioner's order to show cause seeking to remove Citak & Citak as Dr. Dworecki's counsel. However, in May 2013, Citak & Citak asked to withdraw, with their counsel stating that they had attempted to locate substitute counsel for Dr. Dworecki but were unable to do so. On June 3, 2013, the court granted the Citaks' request and appointed Ann Pinciss Berman, Esq., as new counsel for Dr. Dworecki.

Pursuant to 22 NYCRR 130-1.1 (a) and (b), the court, "in its discretion," may award costs, including attorney's fees, as well as impose financial sanctions against an attorney or firm that

engages in "frivolous conduct." When determining whether the conduct undertaken was frivolous, the court must consider the circumstances under which the conduct took place and whether or not the conduct was continued when its lack of legal or factual basis was apparent or should have been apparent (22 NYCRR 130-1.1 [c]). Furthermore, "[t]rial judges should be accorded wide latitude to determine the appropriate sanctions for dilatory and improper attorney conduct and we will defer to a trial court regarding sanctions determinations unless there is a clear abuse of discretion" (*Pickens v Castro*, 55 AD3d 443, 444 [1st Dept 2008]).

22 NYCRR 130-1.1 (c) sets forth three categories of "frivolous conduct": "(1) [conduct which] is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law"; "(2) [conduct which] is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another"; or "(3) [conduct which] asserts material factual statements that are false." "Conduct which violates any of the three subdivisions [of section 130-1.1 (c)] is grounds for the imposition of sanctions" (*DeRosa v Chase Manhattan Mtge. Corp.*, 15 AD3d 249, 250 [1st Dept 2005]). Thus, sanctions and costs have been imposed for insulting behavior to opposing counsel, baseless ad hominem attacks against the court and opposing party, and mischaracterization of the record (*see Nachbaur v American Tr. Ins. Co.*, 300 AD2d 74, 75 [1st Dept 2002], *lv dismissed* 99 NY2d 576 [2003], *cert denied* 538 US 987 [2003]).

Upon our review of the record, we hold that the court's finding that the orders to show cause submitted in motion seq. Nos. 2 and 4 were based on material false statements, which constituted frivolous conduct within the meaning of 22 NYCRR 130-1.1 (c) (3) warranting the imposition of costs, including attorneys' fees, and a monetary sanction, was not a clear abuse of discretion (*see Curcio v Hogan Coring & Sawing Corp.*, 303 AD2d 357 [2d Dept 2003]). As the court found, "the Citaks' filings are replete with misrepresentations, omissions, distortions, and statements taken out of context; and . . . their attacks on th[e] court, its appointees, and petitioner and its counsel, are wholly without merit and made in utter bad faith." Rather than stating that Dr. Dworecki was unwilling to consent to the coguardianship under the terms set forth by the court, and requesting a hearing on that basis alone, Donald's submis-

sions were rooted in material misstatements. Donald falsely asserted that he had objected on behalf of his client to the appointment of temporary coguardians and that the proposed settlement was being fraudulently forced on Dr. Dworecki by the court, when in fact he participated voluntarily, freely and on the record with respect to the imposition of the coguardianship and its terms, to which he did not object at the January 16, 2013 conference. Contrary to the Citaks' contentions, the court afforded Citak & Citak a reasonable opportunity to be heard on the issue of sanctions (*see* 22 NYCRR 130-1.1 [d]).

The dissent acknowledges that the court had before it evidence that Dr. Dworecki was unable to meet many of her personal care needs and that her life was vastly improved by the services the interim special guardian obtained. Nor can the dissent dispute that the court was motivated by a genuine desire to improve Dr. Dworecki's life. Nevertheless, the dissent would vacate the award of sanctions and costs on the grounds that Donald's accusations that the court had run roughshod over Dr. Dworecki's rights and engaged in fraud were justified, and cannot be said to have been made in bad faith. The dissent reasons that Citak & Citak had an ethical obligation to challenge the proposed order and judgment because the court sought to impose the coguardianship on Dr. Dworecki without conducting a hearing on the issue of incapacity or an inquiry into whether she had in fact given her unequivocal consent to the coguardianship and its terms, which was the cause of every problem that ensued. Given these circumstances, the dissent states that Donald's intemperate and disrespectful language was not inappropriate, and that in any event, his criticisms of the court are not grounds for sanctions.

The dissent's perspective on the issue of sanctions is skewed by viewing the proceedings through the wrong prism. While we have no quarrel with the dissent's exposition of the rights of an AIP in an article 81 proceeding, that does not address the determinative issue in this case, namely, whether the court clearly abused its discretion in imposing sanctions and costs based on Donald's material misrepresentations in his applications seeking to bar the entry of the coguardianship order and to dismiss the proceeding. Although the factors addressed in the dissent are relevant to determining whether the court erred in relying on Donald's consent on behalf of his client when she was not present, as the dissent concedes, we are not asked to determine that issue on this appeal.

Nevertheless, we are compelled to address the dissent's specific arguments. Preliminarily we note that in seeking to place the blame on the court and excusing Donald's material misrepresentations as mere missteps, the dissent selectively ignores certain facts that unfolded during this litigation and seeks to color the issues by portraying Dr. Dworecki as a Holocaust survivor who is once again being victimized, this time by the court. In support, the dissent quotes Dr. Dworecki's statement in opposition to the petition that the "intrusion by the government is totally without basis and reminds me of what occurred to me 75 years ago when the Nazi regime came in and took away our possessions and tried to destroy our lives solely because we were Jewish."

However, while we fully appreciate the fears and concerns Dr. Dworecki harbors as a result of her family having to forfeit its assets to escape Nazi Germany, on the record before us, this is a false analogy. By no stretch of the imagination can it be said that the article 81 petition was instituted "without basis." Moreover, the petitioner, the interim special guardian and the court were not seeking to confiscate Dr. Dworecki's assets for their own benefit or to destroy her life. Rather, they were acting to improve, if not save, Dr. Dworecki's life, by obtaining the additional personal and home care services that she desperately needed and could easily afford but was unwilling to obtain for herself due to her extreme frugality.

The dissent believes that we are being insensitive to Dr. Dworecki's unique perspective. However, in this article 81 proceeding, the paramount concern is the best interest of Dr. Dworecki (*see Seth Rubenstein, P.C. v Ganea*, 41 AD3d 54, 64-65 [2d Dept 2007]), and the court's role is to consider whether she is likely to suffer harm because she is unable to provide for her personal needs and manage her property and whether she adequately understands and appreciates the nature and consequences of her limited abilities (*see* Mental Hygiene Law § 81.02 [b] [1], [2]; *Matter of Sandra S.*, 13 AD3d 637 [2d Dept 2004], *lv denied* 5 NY3d 701 [2005]). Accordingly, it would be a disservice to Dr. Dworecki to blindly defer to her extreme frugality, even if it is the result of her family's experiences at the hands of Nazi Germany, at the expense of her overall interest in receiving the additional personal and home care services she so clearly requires to perform the activities of daily living and to ensure her safety and well-being, which were not being provided prior to the filing of this proceeding, despite her extensive financial resources.

Contrary to the dissent's implications, Dr. Dworecki is not merely suffering from occasional senior moments and we are faced with more than the "unremarkable aspects of the normal effects of aging." A letter from a physician, dated April 11, 2012, annexed to the Evaluator's report, stated that the physician was treating Dr. Dworecki "for the management of her chronic medical conditions including hypothyroidism, hypertension, hyperlipidemia, osteoarthritis, and dementia" and that "[o]ver the past few months [Dr. Dworecki] had demonstrated a progressive decline in her memory and her ability to complete her activities of daily living independently." Among other things, the physician stated that Dr. Dworecki: was unable to bathe herself completely and had difficulty dressing; was wearing the same soiled clothing during the last three home visits; could not manage her medications; could not cook or safely reheat food; had a refrigerator and freezer that contained spoiled food; and was unable to manage her commode or to clean her apartment, which was filled with clutter. As a result, Dr. Dworecki was "at risk for falls, malnutrition, illness from eating spoiled food, and due to missing doses of medications and/or taking medications too frequently."[2]

The Evaluator similarly observed in his report that Dr. Dworecki had a number of health issues that compromise her ability to handle her activities of daily living satisfactorily, that she needed "daily assistance bathing, toileting, cleaning her clothes and apartment, shopping and with meal preparation." He also observed that due to her extreme frugality, Dr. Dworecki believed that she had more ability to manage activities of daily living than she in fact had, and that she might not have fully understood that she had the means to provide herself with the assistance she clearly required.

Moreover, Dr. Dworecki's financial vulnerability is not in dispute. Ms. Morrissey recounted how Dr. Dworecki was easily influenced, and had offered Ms. Morrissey half of her estate because she liked her. There was a fear that Dr. Dworecki considered anyone who visited her three or four times to be her

---

**2.** Although another treating physician felt that a guardian was not needed, she noted that Dr. Dworecki was receiving treatment for medical conditions including severe osteoarthritis, gait abnormality, hypertension, hypercholesterolemia, hypothyroidism and cataract. She also acknowledged that Dr. Dworecki had short term memory loss and would benefit from home care to assist her in personal hygiene and insuring that her medication is taken as directed. The physician, however, did not describe any of the conditions she observed during her personal visits to Dr. Dworecki's home.

best friend, and could be taken advantage of by an unscrupulous person or agency. For that reason, there was agreement among all counsel and the court at the January 16, 2013 conference that a particular agency should be barred from visiting her.

The dissent criticizes the court for not following the Evaluator's recommendation that the court allow a trial period during which Mr. Muster would attempt to obtain the necessary services through his power of attorney. However, the dissent ignores that the court did impose the suggested trial period but, with the consent of Burton and Dr. Dworecki at the August 9, 2012 conference, appointed a neutral, Ms. Morrissey, rather than Mr. Muster to obtain the necessary additional services and assess Dr. Dworecki's needs during that period. Particularly, Burton explained to Dr. Dworecki at the conference that the court felt that the assessment must come from an independent person, and "[t]hat is the way we want to go. That is all to help you." The consensus to appoint a neutral appears prudent given the Evaluator's finding that "[Mr. Muster] has not been able to provide for her personal needs satisfactorily up [to] the present moment."

In seeking to excuse Donald's conduct and place the blame on the court, the dissent states that article 81 does not authorize a modified adjudication of a person in need of a guardian, and that a showing of incapacity is always required. However, Mental Hygiene Law § 81.02 provides that

> "(a) The court may appoint a guardian for a person if the court determines: 1. that the appointment is necessary to provide for the personal needs of that person, including food, clothing, shelter, health care, or safety and/or to manage the property and financial affairs of that person; and 2. that the person agrees to the appointment, or that the person is incapacitated."

Accordingly, where the AIP consents, a finding of incapacity is unnecessary. Here, the court acted on the basis of Donald's consent on behalf of Dr. Dworecki to the appointment of co-guardians.[3]

We agree with the dissent that a court should not accept counsel's representation that the AIP has consented to the ap-

---

**3.** The dissent also states that "there is no statutory authorization for the type of alternative form of guardianship contemplated by the court, for those who have neither been found incapacitated nor have personally, unequivo-

pointment of a guardian where the AIP is not present. Pursuant to article 81 of the Mental Hygiene Law, the court must first determine whether the AIP has the requisite capacity to consent, and must then make a finding of the AIP's agreement to the terms of the guardianship, on the record (*see Matter of Cooper [Joseph G.]*, 46 Misc 3d 812 [Sup Ct, Bronx County 2014]). However, this was not the basis for Donald's application to stay the entry of the guardianship order or to dismiss the proceeding. Donald did not argue that the court erred in accepting his consent on behalf of Dr. Dworecki to the appointment of a guardian, without confirming it directly from her. Rather, Donald stated that he did not give that consent and had in fact objected to the appointment of a guardian, or alternatively that there were specific limitations to Dr. Dworecki's consent, and that the court had unilaterally ran roughshod over Dr. Dworecki's rights.

The dissent accepts the Citaks' argument that Donald never explicitly waived a hearing or consented to the appointment of a guardian, and merely suggested a solution under which Dr. Dworecki would be willing to continue accepting the services that had been arranged for her, which was conditioned on Mr. Muster being named as an equal coguardian, without limitation. Stating that there was no valid grounds to reject Mr. Muster as coguardian, the dissent maintains that this Court should not treat Donald's acquiescence after the court laid out its conditions as the equivalent of consent to those terms.

However, it was Donald who charted the course of the proceedings when he advised the court, on the record on January 16, 2013, that he was "looking to . . . on behalf of our client, not to go through with a hearing to determine competency, because quite frankly, your Honor, on the objective fact[s], it would be a difficult case." While Donald maintains, and the dissent agrees, that he always made clear that Mr. Muster's

cally consented to the guardianship and its terms." However, Mental Hygiene Law § 81.23 (a) (1) provides that

"[a]t the commencement of the proceeding or at any subsequent stage of the proceeding prior to the appointment of a guardian, the court may, upon showing of danger in the reasonably foreseeable future to the health and well being of the alleged incapacitated person, or danger of waste, misappropriation, or loss of the property of the alleged incapacitated person, appoint a temporary guardian for a period not to extend beyond the date of the issuance of the commission to a guardian appointed pursuant to this article."

role with respect to Dr. Dworecki's finances could not be limited, the record proves otherwise.

The court stated at the January 16, 2013 conference, "The co-guardianship will be structured in a way that Sabrina Morrissey would be the guardian of her—full guardian of her person. Mr. Muster would serve as co-guardian of her property, *with limited powers* as I outlined, the day-to-day expenses" (emphasis added). After addressing Mr. Muster's inherent conflict of interest based on his status as the residuary beneficiary of Dr. Dworecki's estate, as well as Ms. Morrissey's representation that Mr. Muster had told her that he had "a lot on his plate right now," including taking care of a sick relative, and that he "seemed amenable to not having a formal role," the court reiterated that "Ms. Morrissey would consult with Mr. Muster on major decisions, but ultimately she would make the final determination in the interest of her ward, as she sees fit." Donald did not raise any objection to these limitations.

Still, the dissent asserts that "[i]t was known to all that Muster's marginalization would be a deal-breaker to which Dr. Dworecki would not consent." However, not only did Donald fail to object to the court's allocation of powers, he expressly acknowledged that Mr. Muster's powers would be limited when he stated at the conference:

> "[W]e recognize to the extent that the issues that the Court raised exist, it was for that reason that Mr. Muster indicated that if this were to be the arrangement, it would be one where he would defer— that his appointment is as much for [Dr. Dworecki]'s benefit so that she could be assured that he was in the picture, but with respect to the legal authority, he would not have legal authority to be able to object to expenses or provisions made by Ms. Morrissey with respect to [Dr. Dworecki's] health care."

Furthermore, Citak & Citak submitted an affidavit, sworn to by Mr. Muster on January 16, 2013, in which he acknowledged that "[f]ollowing the Conference" held that day, he had been advised that the court was willing to "appoint[ ] me as Co-Guardian of the Property of Eva Dworecki, *subject to the actions limitations to be set forth in the Order of Appointment*" (emphasis added). Thus, Donald's statements in support of his applications to stay the entry of the coguardianship order and to dismiss the proceeding that any consent he gave on Dr. Dworecki's behalf was conditioned on Mr. Muster being ap-

pointed an equal coguardian, without limitation, were patently false.

The dissent's position that the court had no basis to limit Mr. Muster's authority or to find that his power of attorney did not adequately provide for Dr. Dworecki's needs is puzzling. In determining the suitability of a potential guardian the court is required to consider, among other factors, any conflicts of interest between the person proposed as guardian and the AIP (Mental Hygiene Law § 81.19 [d]). A conflict of interest clearly arises when there is a potential financial gain to the person proposed as guardian at the expense of the AIP (*see e.g. Matter of Mars v Beyen*, 13 AD3d 91 [1st Dept 2004]; *Matter of Chase*, 264 AD2d 330, 332 [1st Dept 1999]). Similarly, inherent conflicts of interest between the AIP and the holder of a power of attorney may render the power insufficient to protect the AIP's interest. Here, the potential conflicts between Mr. Muster and Dr. Dworecki are significant, calling into question his suitability as a guardian and whether his power of attorney adequately provided for Dr. Dworecki.

Unlike a child, Mr. Muster is not a relative of Dr. Dworecki. His sole basis to inherit a portion of her estate is his status as the residuary beneficiary under the 2010 will, which he apparently drafted, or the 2012 will, drafted by Citak & Citak, both of which, despite a 20-year business relationship and friendship, were not executed until Dr. Dworecki was in her 90's. This creates at least two conflicts of interest. First, there is a conflict between Mr. Muster's financial interest as the primary beneficiary of Dr. Dworecki's estate and his obligation, whether as guardian or attorney-in-fact under the power of attorney, to use Dr. Dworecki's available resources to provide her with all necessary personal and home care services, irrespective of their cost. The more Mr. Muster spends on services for Dr. Dworecki, the less he will inherit. Second, if Mr. Muster obtains the personal and home care services that Dr. Dworecki needs against her wishes (because she does not want to incur the expense), he risks alienating her, which could result in Dr. Dworecki changing her will, placing Mr. Muster in an untenable position.

The dissent believes that these conflicts are speculative. However, as reflected in the Evaluator's report, it is clear that as Dr. Dworecki's abilities deteriorated over time, Mr. Muster did not provide her with the additional services that she required. Among other things, the Evaluator observed that

although Mr. Muster had been given the power of attorney, he did not use it to obtain any services for Dr. Dworecki in the four months before the proceeding was filed. Further, although Mr. Muster told the Evaluator that he believed that Dr. Dworecki needed more help than she was currently receiving, he indicated that one of the reasons that he did not obtain that help was because Dr. Dworecki was concerned about the cost. Indeed, Mr. Muster stated in an affidavit:

> "Eva is an independent person and does not like to have others to interfere in her life. Therefore, I would not take it upon myself to act for Eva without her consent or without her asking me to take action on her behalf. If I made a suggestion to Eva regarding her care, and she rejected my suggestion, I could not force Eva to do that which I had suggested."

Although there is no indication of any wrongdoing on his part in his management of Dr. Dworecki's assets, the fact that Mr. Muster maintained an account for her with his employer, generating revenues for himself and/or the firm, created another inherent conflict. Furthermore, it was Mr. Muster who procured Citak & Citak's services. While the Citaks maintain that Dr. Dworecki was their client, questions were raised as to whether Citak & Citak was at times acting to protect Mr. Muster's interests, rather than Dr. Dworecki's, including the preparation of the new will after this proceeding was commenced.

Thus, unlike *Matter of Robinson (Schlein)* (272 AD2d 176 [1st Dept 2000]), cited by the dissent, this is in fact a case where there is clear evidence that Mr. Muster had inherent conflicts of interest and that he did not use the power of attorney to obtain the services that he knew Dr. Dworecki needed. This failure to obtain needed services prior to the filing of the proceeding also distinguishes this case from *Matter of Bodek* (NYLJ 1202725719135, *5 [Sup Ct, Kings County 2015, Pesce, J.]), cited by the dissent, where the AIP's needs were being met pre-petition by, inter alia, retaining a 24/7 home health aide and arranging for biweekly nursing visits.

Donald's contention that he was surprised by the January 30, 2013 order, which directed the submission of a final order and judgment, is also belied by the record, which reflects the court's express request for its submission: "What I would like is for Ms. Sherman [attorney for petitioner] to settle [a] final

order and judgment with regard to all of this with counsel and Ms. Morrissey, and submit that to me. We will do that in a four-week period." Indeed, when the court discussed the interim special guardian's immediate need for certain additional powers, Donald supported the request, stating: "By way of simplicity, that might be the easiest thing to accomplish the same goal until the final order is submitted to the Court." Furthermore, after the January 30, 2013 order was executed, Burton stated in his affirmation of services that he was trying to work out the terms of that order with the court and interim special guardian, which further establishes that the Citaks were fully aware of and had agreed to the procedure set forth by the court.

Donald's purported objection to the adjudication that Dr. Dworecki was in need of a guardian for her person and property is also belied by the record. The court expressly stated:

"Oh, incidentally, this would also be an adjudication of a person in need of a guardian, since it's on consent and we have not had a full hearing with an adjudication of incapacity, and we won't need that if what we are determining is that her needs are such that she is a person in need of a guardian. Her condition includes a form of dementia which causes severe memory impairment such that she cannot remember five minutes later, and it certainly affects her ability to properly take her medications. She should not be allowed to cook or shop."

Donald did not object to this adjudication or otherwise indicate that a hearing on competency was required. Citak & Citak's consent on behalf of their client to the adjudication that Dr. Dworecki was a person in need at the January 16, 2013 conference is again evidenced by their failure to take action after the issuance of the January 30, 2013 order, and Burton's affirmation of services stating that he was working with the court and the interim special guardian on the terms of a final order, which was based on that adjudication.

The dissent contends that Donald's silence and acquiescence cannot be equated with consent. The dissent speculates that Donald did not state his objections because he reasonably believed that the court was just making suggestions and that Dr. Dworecki would have further input. However, at the sanctions hearing, the Citaks' counsel acknowledged that if the Citaks were dissatisfied with the proposed terms of the coguardianship outlined by the court, they

"should have spoken up, should have said something to you. Should have said 'Look, Your Honor, before you assign to Ms. Sherman or Ms. Morrissey the drafting of a proposed order, I would like to go back to my client and have a talk with her.' He didn't do that. That was a mistake on his part and he acknowledges that."

When the Citaks' counsel persisted in claiming that his clients were confused or misunderstood that the conference was going to result in the issuance of an order, the court asked "[i]f your clients were confused or had a misunderstanding, if there was something ambiguous, why didn't they make those applications." Counsel replied: "They should have. You're absolutely correct." When the court added that instead the Citaks denied giving their consent and participating in the structure and formation of the guardianship, and had accused the court of misrepresentation and fraud, counsel replied: "I just can't justify those words."

The dissent's assessment of Donald's conduct also ignores other material admissions by the Citaks' counsel at the July 11, 2013 hearing on sanctions, including counsel's acknowledgment that his

"clients don't intend to try to justify what they said in the Motion Sequence Number 4, the motion that led to your decision to consider sanctioning them. That was not excusable. I'm here not to try to justify it but to apologize on their behalf for that conduct. They regret it. I can't stand before you and say that it was appropriate."

When the court stated that the conduct was not just disrespectful, but that the Citaks had asserted that the court had engaged in misrepresentation and fraud, and ran roughshod over Dr. Dworecki's rights, counsel replied: "There is no question."[4]

The dissent posits that counsel's statements are of no consequence because he may have made them to appease the court, even if he did not believe that the concessions and apologies were truly warranted. This is rank speculation, as is the dissent's attempt to craft an excuse for Donald's failure to

---

4. This, among other things, distinguishes this matter from my dissent in *DeRosa v Chase Manhattan*, where "plaintiff's counsel's assertion that he acted in good faith [was] uncontradicted" (15 AD3d at 251). In contrast, here Donald's counsel acknowledged that many of his actions were unjustified.

object to the coguardianship terms when they were set forth by the court at the January 16, 2013 conference.

The dissent's belief that Donald was right in accusing the court of fraud is particularly disturbing. In his affidavit in support of motion sequence number 4, Donald asserted:

"Dr. Dworecki has a constitutional right to know how much of her money is being spent as a result of the Orders and/or directions of this Court, what services are being procured for her, and whether she wishes to have those services. To deceive her into believing that some[one] else is paying for the services being provided to her constitutes a fraud being practiced upon her—something that this Court should never countenance much less participate in!"

However, at the August 9, 2012 conference, the court unequivocally informed Dr. Dworecki, in person, that "[t]he [additional] services will, of course, have to be paid for . . . through your funds." When Dr. Dworecki stated that she was worried that there would be a lot of expenses that were not there before, Burton advised her "[t]here will be, yes." When the court told Dr. Dworecki that it would review the costs of the additional services to make sure they were reasonable, but that "we're not going to save money at the expense of your safety or your health," Dr. Dworecki responded, "Of course not." The dissent's position that this disclosure pertained only to the trial period ignores the statements of the court and Burton to Dr. Dworecki, in response to her expressed concerns over costs, that only necessary services would be continued after the trial period—which clearly conveyed to Dr. Dworecki that she would have to pay for the necessary services that were retained.

As to the January 16, 2013 conference, the court and counsel again discussed the fact that even though Dr. Dworecki recognized the benefit of the additional services she had been receiving during the trial period, she remained troubled by the cost. During this discussion, the court stated:

"So, for example, when we are talking right now about restricting things, services, because she has such a concern about the way the monies are being spent, we all know realistically that her monies are there for her. She could have anything she needs;

she should have it, you know, and she should have it without discomfort, but to the extent that there is discomfort, she may not need full information about it, and, you know, that is important . . .

"It's preferable, obviously, not to necessarily give her full information. That is just going to disturb her . . . Ms. Morrissey has been very sensitive to that and has found ways to step around various costs."

The court did not state that Dr. Dworecki should be deceived into believing that someone else was paying for the services. Moreover, the dissent conveniently ignores that not only did Donald not object to this approach, he affirmatively endorsed it, stating, "I agree with Ms. Morrissey that there is no need, necessarily, to show our client every check that goes out for every reason," and that he approved a system under which the "only finances that [his] client deals with" would be when she and Mr. Muster "sit down together and they go over the rent owed, the telephone bill, the electric bill, and checks are written out [which she signs]."

Furthermore, the court appointed Mr. Muster coguardian and the coguardianship order did not prohibit either him or Ms. Morrissey from answering any questions posed by Dr. Dworecki as to how her monies were being spent or direct them to hide anything from her. In fact, the order directed the coguardians to "exhibit the utmost degree of trust, loyalty and fidelity in relation to Dr. Dworecki" and provided that Ms. Morrissey "shall not restrict access to her financial advisor or attorneys of record." While the dissent is of the opinion that the coguardianship order deprived Dr. Dworecki of any control over her life, it expressly directed the coguardians to "afford Dr. Dworecki the greatest amount of independence and self determination with respect to her personal needs in light of her functional level, understanding and appreciation of her functional limitation, and personal wishes, preferences and desires with regard to managing the activities of daily living."

The dissent states that no sanctions or costs should be awarded with respect to motion seq. No. 4 because the order to show cause was not signed. However, at the hearing the Citaks' counsel argued the opposite, asking that the sanctions be limited to that filing. Furthermore, the order to show cause was reviewed by the court and monetary sanctions may be imposed based on the false statements therein.

Nor do we agree with the dissent that sanctions are ill advised as a matter of policy, or that we are extending the law of sanctions "beyond any existing precedent to the point where it will dangerously chill zealous advocacy and impair the independence of the trial bar." Donald is not being held financially accountable because his client "refused to be pushed any more" and he is not being punished for trying to protect his client's interests. Rather, it is the numerous material misrepresentations by Donald in his applications to stay the entry of the coguardianship order and to dismiss the proceeding, and the disrespect directed at the court, which challenged the integrity of the judicial process, that constitute frivolous conduct under 22 NYCRR 130-1.1, justifying an award of sanctions (*see Shields v Carbone*, 99 AD3d 1100, 1103 [3d Dept 2012] [affidavit accused the court of rendering decisions for political or financial reasons, willfully disobeying the law, and either committing crimes or condoning the commission of crimes by other public officials]; *Matter of Kyle v Lebovits*, 17 Misc 3d 1124[A], 2007 NY Slip Op 52132[U] [Sup Ct, NY County 2007] [sanctions imposed where the petitioners made very serious and disturbing allegations that Judge Lebovits, acting in concert with Judge Wendt, coerced an unfair settlement of the attorney fee issue], *appeal dismissed in part* 58 AD3d 521 [1st Dept 2009], *lv dismissed in part and denied in part* 13 NY3d 765 [2009], *cert denied* 559 US 938 [2010]).

Contrary to the position of the dissent, these material false representations are not "understandable" and should not be excused based on a lawyer's obligation to zealously represent his client. Rule 3.1 (b) (3) of the Rules of Professional Conduct (22 NYCRR 1200.0) provides that conduct is frivolous if "the lawyer knowingly asserts material factual statements that are false." Rule 3.3 (a) (1) provides a lawyer shall not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Rule 3.3 (f) (2) provides that a lawyer appearing before a tribunal shall not "engage in undignified or discourteous conduct." Here, Donald's affirmations are replete with outrageous, overblown and insulting comments about the court and Ms. Morrissey that were disproved by the record and lack any good faith basis. That the court may have erred in accepting Donald's consent on behalf of his client without confirming in person her capacity to consent and her agreement to all terms, does not excuses Donald's frivolous conduct.

This Court's recent decision in *Matter of Russo v New York City Hous. Auth.* (128 AD3d 570 [1st Dept 2015]), on which the dissent relies, does not mandate a different result. In *Russo,* we were not asked to review whether the trial court had clearly abused its discretion in imposing sanctions for frivolous conduct. Rather, we considered a request by the petitioner, to this Court, to impose sanctions on the Housing Authority for its "criticisms of the court" in its appellate brief. Although this Court found in the exercise of its discretion that counsel's criticisms did not warrant the imposition of sanctions, as set forth above, here we are dealing with more than critical comments. In asserting that the court had ridden roughshod over Dr. Dworecki's rights and had committed a "fraud" against her, Donald misrepresented his active participation in structuring the temporary guardianship in collaboration with the court, which carefully considered Dr. Dworecki's desires and opinions in designing a guardianship to best meet her needs. Unlike *Llantin v Doe* (30 AD3d 292, 293 [1st Dept 2006]), where we reversed the imposition of sanctions for " 'frivolous conduct,' i.e., 'the disingenuous statement of readiness for trial,' " here, the record shows that Donald intentionally made the false misrepresentations in his applications, including his claim that he never agreed to any limitations to Mr. Muster's powers as a co-guardian or to the procedure adopted by the court, and that he acted in bad faith.

Although monetary sanctions against Donald are warranted, the $7,500 monetary sanction against Burton is vacated. While Burton was clearly involved in the representation of Dr. Dworecki, he did not submit an affirmation, or argue in court in connection with the motions at issue (*see AQ Asset Mgt., LLC v Levine*, 119 AD3d 457, 464 [1st Dept 2014]). Given these circumstances, the imposition of one sanction of $7,500 against Donald is appropriate.

The imposition of costs, including attorneys' fees, is also warranted under the circumstances to the extent that additional services were required and performed as the direct result of the frivolous conduct (22 NYCRR 130-1.1 [a]). However, the court failed to set forth in a written decision "the reasons why the court found the amount awarded or imposed to be appropriate" (22 NYCRR 130-1.2). Accordingly, the award of costs is vacated, and the matter remitted to Supreme Court for compliance with 22 NYCRR 130-1.2 (*see Fraccola v 1st Choice Realty, Inc.*, 124 AD3d 1360 [4th Dept 2015]), including an explanation

of why the amounts awarded to each recipient are related to the sanctionable conduct and appropriate, and for the entry of a judgment (*see Weisburst v Dreifus*, 89 AD3d 536 [1st Dept 2011]). In this regard, we note that, among other things, only one attorney filed papers in opposition to Citak & Citak's motions; the order to show cause for motion seq. No. 4 was not signed and therefore did not have to be opposed, and Dr. Dworecki's new counsel, Ms. Berman, was not counsel of record until after the court rendered its May 1, 2013 order finding frivolous conduct, but was nevertheless awarded $6,280. Pursuant to 22 NYCRR 130-1.1 (b) the costs should be imposed against Donald individually, or Citak & Citak, as the court deems appropriate.

Lastly, we modify to grant the Citaks' application for attorneys' fees incurred in connection with their representation of Dr. Dworecki, only up to, but excluding, their preparation and filing of the frivolous motions, and deny all legal fees incurred in connection with those motions, including the related sanctions hearing and this appeal.

Accordingly, the order of the Supreme Court, New York County (Laura Visitacion-Lewis, J.), entered on or about May 1, 2013, and the order of the same court and Justice, entered July 30, 2013, which, insofar as appealed from as limited by the briefs, imposed sanctions upon nonparty attorneys Burton Citak and Donald L. Citak, individually, in the sum of $7,500 each, and imposed $12,639.18 in attorneys' fees, $12,314 in costs for extraordinary guardianship services, and $687.50 in costs for additional court evaluator services against the Citaks jointly, and denied legal fees to the Citaks in this matter, should be modified, on the law, the facts, and in the exercise of discretion, to vacate the award of $7,500 sanctions against Burton Citak, Esq., to vacate the award of attorney's fees, costs for extraordinary guardianship services, and additional court evaluator services, and to remand for compliance with 22 NYCRR 130-1.2, and to vacate the denial of Citak & Citak's request for attorney's fees and to remand for a determination of the reasonable fees owed Citak & Citak by its client consistent with this opinion, and otherwise affirmed, without costs.

Tom, J.P. (concurring). Nonparty attorneys Burton Citak and Donald L. Citak appeal from two orders, insofar as they imposed sanctions upon each of the Citaks in the sum of $7,500;

ordered the Citaks to pay $12,639.18 in attorneys' fees, $12,314 in costs for extraordinary guardianship services and $687.50 in costs for additional court evaluator services; and denied legal fees to the Citaks. The issues raised on this appeal are limited solely to the collateral matter of the imposition of costs and sanctions on counsel and their entitlement to legal fees. The disposition of the article 81 guardianship proceeding in the appointment of a temporary guardian for Eva Dworecki, an alleged incapacitated person (AIP), upon consent was never appealed and is not before us. With all due deference to my colleagues, their extensive discussion on issues outside the scope of sanctions and legal fees is without legal significance and is mere dicta.

A short synopsis of what transpired in the course of this article 81 petition is informative. In July 2012, proceedings were held in connection with the petition to appoint a guardian of the person and property of Dr. Eva Dworecki, then 94, brought by the Nazi Victim Services of Selfhelp Community Services, which had provided assistance to her since 2002 and expressed concern regarding her declining memory and judgment. For instance, Dr. Dworecki could not remember if she had eaten, put food on her stove to heat, or taken her medication, nor was she able to attend to her personal needs, causing a serious risk to her health. She suffers from numerous medical conditions and was unable to manage her finances due to her impaired vision and memory loss. She did not recall whether she had paid her bills or how much money she had. Furthermore, she had been the victim of financial exploitation by one of her home health aides. Extensive discussions were conducted in camera with Donald Citak and Burton Citak, counsel for petitioner, and the Court Evaluator, Matthew Milford, at which the structure of the proposed guardianship was discussed. After affording the Citaks time to consult with their client, the court conducted proceedings on the record, during which Dr. Dworecki acknowledged her need for assistance and consented to the appointment of an interim special guardian. In an order dated August 10, 2012, the court appointed Sabrina Morrissey, Esq., as "special interim guardian" of Dr. Dworecki, and provided that Dr. Dworecki's long-time friend and financial advisor, Edward Muster, would continue to assist with the payment of Dr. Dworecki's regular expenses. At a status conference held the following January, Donald Citak acknowledged "that there ha[d] been significant improvements in the day-to-day life" of his client following her receipt of vari-

ous services arranged by her guardian. While indicating that Dr. Dworecki displayed some ambivalence due to her desire to retain her independence, counsel waived the article 81 competency hearing and finding of incapacity stating that he and his client would consent to a continued guardianship on condition that it be labeled as a "temporary" guardianship and that Morrissey and Muster be named joint temporary guardians.

By order entered January 31, 2013, the court extended the temporary guardianship for a period of five years, during which time Morrissey and Muster were to serve as coguardians. The order recites that on August 9, 2012, Dr. Dworecki had consented to the appointment of an interim special guardian and that on January 16, 2013, the Citaks had advised the court that Dr. Dworecki acknowledged her continued need for assistance and consented to a temporary guardianship of indefinite duration, with Muster continuing to assist Dr. Dworecki with her finances. The order concluded by directing the interim guardian, Sabrina Morrissey, Esq., to settle a final order and judgment.

In the first of the applications at issue, Dr. Dworecki, by the Citak firm, filed an order to show cause with temporary restraining order to stay entry of any order appointing a guardian and to schedule an article 81 hearing on her competency and capacity. In disregard of his previous representations acknowledging Dr. Dworecki's need of assistance and consenting to the appointment of a temporary guardianship to the court, Donald Citak submitted an affirmation asserting,

> "*at no time, did Dr. Dworecki's* [sic] *consent to what was happening to her, nor did she in any way waive her right to consent to the imposition of a Guardian*. This Court appears to have completely ignored Dr. Dworecki's wishes and appears ready to run completely roughshod over them and over her rights" (emphasis added).

He also alleged that the court had wrongfully and unlawfully denied Dr. Dworecki the right to counsel of her own choosing and was attempting to "hide, misconstrue or conceal facts from Dr. Dworecki." He further accused the court of having

> "completely disregarded what Dr. Dworecki herself believes or feels, without any proof or evidence that such drastic intervention into Dr. Dworecki's life is

warranted or necessary, either with respect to her personal home care needs or the management of her financial affairs, and without exploring the least intrusive form to provide Dr. Dworecki with whatever assistance it perceives she needs."

During oral argument, Donald Citak maintained that he had "strenuously objected to the Court's interpreting what [the Citaks] may have consented to at that time and what the Court can consider consenting." He requested a full article 81 hearing, and the court signed the TRO directing that a hearing be held on April 30, 2013.

Prior to the scheduled article 81 hearing, petitioner brought a motion seeking the removal of the Citak firm as counsel to Dr. Dworecki. The grounds included conflict of interest, unfamiliarity with article 81 law, purportedly frivolous and untrue allegations against petitioner, unethical behavior toward Dr. Dworecki and other interested parties bordering on malpractice, and a general lack of courtesy toward Dr. Dworecki, the motion court, and the other attorneys involved in the proceeding.

In the second motion at issue, Dr. Dworecki, through the Citak firm, moved by order to show cause to dismiss the petition. She alleged deprivation of right to counsel and physician-patient privilege, conflict of interest resulting from the motion court's failure to appoint an independent court evaluator and deliberate efforts by the motion court, the temporary guardian, and social workers to mislead and deceive her by failing to disclose the truth of the proceedings. Donald Citak submitted a 46-page supporting affirmation enumerating the numerous purported ways in which Dr. Dworecki's rights had been violated by the motion court and others.

The court consolidated both motions for disposition, declining to sign the order to show cause seeking dismissal of the petition and vacating the prior interim relief staying entry of the order appointing a guardian. Accurately summarizing the character of the applications, the court stated:

> "In flagrant disregard of their prior consent and participation in the establishment of a guardianship for Dr. Dworecki, as well as their waiver of proceedings in favor of an adjudication of Dr. Dworecki as a Person In Need of a Guardian, the Citaks impugn the integrity and credibility of this court . . . [A] detailed and thorough review of the

record . . . has unequivocally established that the Citaks' filings are replete with misrepresentations, omissions, distortions, and statements taken out of context; and that their attacks on this court, its appointees, and petitioner and its counsel, are wholly without merit and made in utter bad faith."

The record amply supports Supreme Court's finding that filings and remarks made by counsel during oral argument contained a number of inaccurate and outright false material statements in support of the two orders to show cause, accusing the court of misconduct and dereliction in its duties that were devoid of merit, and undertaken "primarily . . . to harass or maliciously injure another," thereby warranting the award of costs and sanctions for engaging in frivolous conduct (22 NYCRR 130-1.1 [c] [2]). What is disturbing is the fact that the court order appointing a temporary guardian for the AIP, and the focus of counsel's attack, was consented to by Dr. Dworecki and counsel before the court. It should be noted that following the April 30, 2013 court order imposing costs and/or sanctions, the Citak firm voluntarily withdrew as counsel to Dr. Dworecki.

At the sanctions hearing, it was conceded by counsels' attorney that statements accusing the court of fraud were unjustifiable, acknowledging "the inappropriate style and the disrespectful tone" of the submissions. Nevertheless, it is equally clear that the statements are attributable to Donald Citak, and there is a lack of record support for the imposition of an equivalent sanction against Burton Citak, who neither argued before the court nor submitted an affirmation in connection with the respective applications. Finally, further proceedings are required to determine the appropriate costs to be awarded (22 NYCRR 130-1.2), to reduce the award of costs and sanctions to a judgment and to set the reasonable amount of legal fees payable to Citak & Citak for their representation of Dr. Dworecki prior to the filing of the frivolous orders to show cause.

KAPNICK, J. (concurring). I concur with the opinion of Justice Andrias. However, I disagree with his criticism and distrust of Mr. Muster and concern about Mr. Muster's impartiality and/or conflict of interest in this proceeding. Nevertheless, despite the dissent's protestations to the contrary, that issue, and the issue of whether Mr. Muster should have been appointed the full guardian or coguardian of Dr. Dworecki's property, without limitation, are not before us on this appeal, and do not, in my

opinion, affect the ultimate conclusion reached by the majority upholding the imposition of sanctions by Supreme Court against Donald Citak.

SAXE, J. (dissenting). Supreme Court committed two egregious errors in this proceeding, one which most probably will never be corrected and the other which can and should be.

The first error, which is not the focus of this appeal but which informs all else that happened here, was the unlawful imposition of an article 81 guardianship on a 94-year-old Jewish survivor of Nazi Germany against her will, without her consent and without a hearing.

The second error was made when the court imposed punitive sanctions and costs upon the elderly woman's lawyers for protesting the court's action in their motion papers. And, while these lawyers used strong words to convey their opposition to the unlawful order, they were only that—words—and did not cause any disruption to the court other than to point out the necessity of a statutory-mandated hearing to protect their client's due process rights. For this, they were hammered with severe costs and sanctions by an irate court.

Introduction

In its haste to impose its own sense of what would improve the life of the Alleged Incapacitated Person (AIP), Supreme Court ignored the AIP's repeatedly expressed, deep desire for self-determination and independence. The court simply failed to appreciate or take into account the fears and concerns of this then-94-year-old German-Jewish Holocaust survivor, Dr. Eva Dworecki, whose family had been forced to flee Germany, surrendering all of their assets to the Nazi government, and who as a result remains suspicious of forced intrusions and financial claims asserted by authorities. She explicitly did not want strangers, appointed by government authorities, taking control of her assets and her personal decisions. Now, at the end of her days, she is being met with a dazzling array of providers eager to "assist" her, for which they can claim payment from her carefully conserved estate.

The majority's assertion that it "fully appreciate[s] [Dr. Dworecki's] fears and concerns" is a hollow protest. Supreme Court failed to consider the unique perspective Dr. Dworecki brought, as a result of her family's experience, to the type of "assistance" at issue here. While some elderly people might welcome such attention, assistance, and intrusion, Dr. Dworecki

did not; her past experiences made her ambivalent and fearful about giving up control of her assets and decision-making. Not only did Supreme Court ignore the doubts, fears, ambivalence and concerns she expressed openly to the court, but, now, the majority is perpetuating that lack of sensitivity.

Once Dr. Dworecki's lawyer, Donald Citak, recognized (perhaps belatedly) how Supreme Court intended to impose on his client exactly the type of excessively intrusive and controlling "assistance" that his client had rightly been so worried about, Donald Citak employed strong language in his challenge to the proposed order, and again after that order was executed. He also minimized the extent to which his failures may have been partly to blame for the court's belief that its authority to enter such an order would not be challenged. But, in the face of his elderly client's legitimate objections to the actions taken by the court without her consent and against her wishes, counsel for Dr. Dworecki had not only the right, but, indeed, the obligation as a zealous advocate to bring a motion on behalf of the client, challenging the court's order and the proposed order noticed for settlement in accordance with that order (*see Board of Educ. of Farmingdale Union Free School Dist. v Farmingdale Classroom Teachers Assn., Local 1889, AFT AFL-CIO*, 38 NY2d 397, 404 [1975]; Code of Professional Responsibility EC 7-1). Moreover, the content and phrasing of counsel's protests, even if inadvisable, cannot properly be characterized as frivolous as that term is used in part 130 (Rules of Chief Admin of Cts [22 NYCRR] § 130-1.1).

The court, instead of addressing the real problem—the client's legitimate concerns and protests over what had taken place in her absence—focused on the wrong problem by proceeding as if the issue to be addressed was counsel's language, carelessness and inconsistencies. The resulting award of costs and sanctions is wrong on several grounds, but is particularly offensive because the dubious sanctions issue caused the court to turn its attention away from the real injustice done to Dr. Dworecki, and provided a convenient cover to mask the injustice.

The majority's statement that "[b]y no stretch of the imagination can it be said that the article 81 petition was instituted 'without basis' " conscientiously strives to miss the point; I am not questioning the propriety of the commencement of the proceeding. The majority accurately asserts that petitioner, the interim special guardian and the court were not acting to

destroy Dr. Dworecki's life. Her independence, of course, is another matter.

While we will generally defer to a trial court's determination to impose sanctions unless there is a clear abuse of discretion (*see Pickens v Castro*, 55 AD3d 443 [1st Dept 2008]), here the court's multiple errors of law in the underlying guardianship proceeding and its separate multiple errors of law in imposing sanctions, costs and attorney's fees deprived its determination of the insulation otherwise accorded by our deferential standard of review.

Facts—The Guardianship Proceeding

By petition dated July 6, 2012, Nazi Victim Services of Self-help Community Services (petitioner) sought appointment of a guardian for Dr. Eva Dworecki, then 94 years old.

Dr. Dworecki was born on July 14, 1918 in Berlin, Germany. Her parents were wealthy and owned many properties in pre-war Germany. Her father had fought in the German Army in World War I and was awarded the German equivalent of the Medal of Honor. But that level of financial comfort and social status was not to last. In 1939, her father was rounded up along with approximately 5,000 other wealthy Jews in the city and placed in a Nazi concentration camp. However, because of her father's prominence and wealth, some of his friends intervened so that he and his family were permitted to buy their freedom and leave the country on the condition that he surrender all of his assets to the Nazi government. He accepted those conditions, and the family fled Germany in 1939. Understandably, Dr. Dworecki, who was a young adult at the time, continues to bear the scars of the loss of her family's freedom, the potential loss of her own, her family's flight from their comfortable existence to a strange land, and the loss of her family's assets at the hands of the Nazis, and likely is acutely sensitive to the reach of government asserting dominion and control over her liberty and property once again.

Dr. Dworecki has resided for the past 47 years in an apartment at the Esplanade, which is now a senior residence, and she hopes to remain there for the rest of her life. The facility provides weekly cleaning services, changing the linens, cleaning the bathroom and commode and mopping the floor.

Being limited by her age, cataracts, and short-term memory problems, and without children or close relatives, she has been relying on a good friend, Edward Muster, for over 22 years.

She first met him when he was assigned to replace an account representative with whom she was dissatisfied at the company that was handling her stock portfolio. Under Muster's handling, her asset portfolio has virtually doubled over the years, and is now worth over $2.6 million. Muster engaged an accountant to make sure that her tax returns were filed, and, until the proceeding was commenced, he assisted her in many other ways, not for compensation, but as a friend, including making arrangements for medical care.

In August 2010, two years before this proceeding began, Dr. Dworecki named Muster as executor of her will, as well as her residuary beneficiary. Later, in March 2012, she also executed a power of attorney naming him as her attorney-in-fact. She states that Muster has in many ways replaced the family that she no longer has.

The guardianship petition alleged that Dr. Dworecki appeared to be declining in her short-term memory, judgment, and ability to perform activities of daily living. For instance, her impaired vision seemed to be preventing her from cleaning her apartment or going out of doors. It was also alleged that she could not remember if she had eaten, put food on the stove to heat, or taken her medication, and that her apartment was severely cluttered with papers and other items, creating a risk of falling, and that she was unable to empty and properly clean her commode, causing a risk to her health and to others in her building. It was also alleged that Dr. Dworecki was unable to manage her finances due to her vision and memory loss, and did not recall whether she had paid her bills or how much money she had. Finally, the petition challenged the propriety of the power of attorney Dr. Dworecki had given to Muster.

The petition was supported by a physician's letter, deemed so probative by the majority that it recites the letter's contents at length despite its being inadmissible, as unsworn and not affirmed to be true under penalty of perjury (*see* CPLR 2106; *Lazu v Harlem Group, Inc.*, 89 AD3d 435 [1st Dept 2011]; *McLoyrd v Pennypacker*, 178 AD2d 227, 228 [1st Dept 1991], *lv denied* 79 NY2d 754 [1992]; *Nicolaides v Nyack Hosp.*, 279 AD2d 617 [2d Dept 2001]; *Cody v Parker*, 263 AD2d 866, 868 [3d Dept 1999]; *Fisher v Ciarfella*, 300 AD2d 1028 [4th Dept 2002]). This letter claimed that the writer had visited Dr. Dworecki at least three times during an unspecified period and reported the writer's observations, including that Dr. Dworecki was experiencing unremarkable aspects of the normal effects

of aging[1] and that she needed additional services. The letter, dated approximately three months before this guardianship proceeding was commenced and addressed "to whom it may concern," did not set forth the writer's qualifications or experience and, significantly, did not even opine as to whether a guardian should be appointed for Dr. Dworecki.

Dr. Dworecki obtained representation by Burton Citak and Donald Citak of the law firm of Citak & Citak, who submitted opposition to the guardianship petition on Dr. Dworecki's behalf. In Dr. Dworecki's affidavit, she made clear that she wanted to be able to continue to rely on Muster, her trusted friend for over 20 years, and did not want to cede authority over her life and choices to a stranger.

Also submitted in opposition to a guardianship was an affidavit by Dr. Dworecki's treating physician (relegated by the majority to discussion in a footnote), which, in contrast to the unsworn and therefore inadmissible physician's letter submitted in support of the petition, set forth this physician's experience, based on her observations during four visits per year over a four-year period, and provided her opinion regarding Dr. Dworecki's need for a guardianship. This physician stated that, despite her short-term memory problems, Dr. Dworecki was fully competent and *did not need a guardian*, since her needs could be adequately addressed by additional home services. Furthermore, the director of the senior living residence where Dr. Dworecki resides explained in her affidavit that the facility provides housekeeping services and can provide home aides.

The assigned Court Evaluator reported, among other things, that Dr. Dworecki agreed that she needed more help than she was currently receiving, but expressed concern that she could not trust hired help, having previously been the victim of theft by a household aide. The Court Evaluator also indicated that Dr. Dworecki overstated her ability to take care of her own daily needs, and that her extreme frugality prevented her from being willing to pay for the services she needed, particularly since she perceives even normal, market-rate costs as exces-

---

1. The majority makes a point of affirmatively asserting that Dr. Dworecki's condition is more severe than "the normal effects of aging." However, in the absence of a hearing, and in the face of conflicting submissions regarding her exact condition, we cannot properly make any findings either as to her condition or as to the extent of services that would constitute the least restrictive alternative in the guardianship context.

sive. He reported that she adamantly opposed the appointment of a guardian, protested the allegation of mental incapacity, and understood—and felt insulted by—the contents of the petition.

The Court Evaluator concluded that it was *not* necessary to appoint a guardian at that time; he recommended instead that the court reinstate Muster's power of attorney and give Muster some time to obtain the personal care assistance that Dr. Dworecki requires. Contrary to the implication from the majority's selective recitation of excerpts from his report, the Court Evaluator's less than assured finding that "it *may* be necessary to appoint a guardian" was posited only as a fallback alternative "*if* the court finds it necessary to appoint a [g]uardian" (emphasis added).

Finally, the Court Evaluator specifically recommended that Dr. Dworecki's presence at the hearing on this matter not be waived. The court did not implement any of the recommendations of its own appointed independent Court Evaluator.

On August 9, 2012, the court held a conference with counsel for each party and the Court Evaluator, at which they discussed the structure of the proposed guardianship. Proceedings were then held on the record with Dr. Dworecki, during which she acknowledged her need for some assistance and consented to the appointment of an "interim special guardian" for a "trial period." While the majority states that, at this conference, the court informed Dr. Dworecki that she would have to pay for the new special services to be implemented by the special interim guardian, and that Burton Citak reiterated this to Dr. Dworecki in open court, these explanations referred only to the cost of services for the limited interim period and said nothing about Dr. Dworecki's paying for the full panoply of services to be provided during a five-year guardianship term.

Thereafter, in an order dated August 10, 2012, the court appointed Sabrina Morrissey as special interim guardian of Dr. Dworecki, and stated that Muster was permitted to continue to assist Dr. Dworecki with paying her bills, although it revoked the power of attorney naming Muster, purportedly pursuant to Mental Hygiene Law § 81.29 (d).

Morrissey filed four reports with the court in the five months that followed, regarding her substantial progress in arranging for various forms of assistance for Dr. Dworecki. While Muster had earlier begun to arrange for Dr. Dworecki to have cataract surgery, he had encountered resistance from Dr. Dworecki, who

had disliked the physician with whom she met; Morrissey succeeded in obtaining Dr. Dworecki's cooperation in having the surgery, with excellent results. Morrissey also succeeded in convincing Dr. Dworecki to cooperate with having daily aides clean the apartment, prepare meals beyond the single meal delivered daily by Meals on Wheels, and help Dr. Dworecki with bathing and dressing. She reported that she avoided responding to Dr. Dworecki's queries about the cost of all the new assistance.

Morrissey acknowledged that while Dr. Dworecki expressed genuine appreciation for this assistance, she also expressed concern for how much all this assistance was costing her, as well as a desire that the hours in which she received assistance be reduced, for example, having part-time help in the mornings and evenings rather than having an aide present with her throughout the day.

On January 16, 2013, the adjourned date set for a status update, Dr. Dworecki's appearance was waived, due to severe weather conditions.[2] While this court appearance had been scheduled merely as a status conference, the court quickly took advantage of her absence to arrive at a final disposition of the matter, conclusively determining important matters regarding the remainder of Dr. Dworecki's life in her absence and against her expressed preferences.

Attorney Donald Citak initially reported to the court, agreeing "that there ha[d] been significant improvements in the day-to-day life" of Dr. Dworecki following her receipt of various services arranged for by her guardian. However, Donald Citak explained that while Dr. Dworecki had indicated that she would like these new services to continue, she also indicated her desire for independence and that she did not want the guardianship to continue.

It is important to carefully parse what Donald Citak actually said in this appearance. He did not explicitly waive a hearing on his client's behalf. He did not consent on his client's behalf to a full-fledged guardianship with complete, broad authority over the client's life, decisions, and property, which reduced Muster's role to writing checks for Dr. Dworecki's basic monthly

---

2. In fact, while a snowstorm had been predicted for the region, temperatures were between 33 and 39 degrees, and less than an inch of snow fell in Manhattan (*see* http://www.nycareaweather.com/2013/01/january-16-2013-storm-summary/; http://www.almanac.com/weather/history/NY/New%20York/2013-01-16).

expenses. What he did was to suggest that "the solution with respect to having Eva accept the services that she requires" could be to continue the special interim guardianship, or, alternatively, to term the position that of a "temporary guardian," in which the importance of Muster's role in Dr. Dworecki's life "is not to be minimized." He emphasized that there were strict parameters to what his client would be willing to consent to:

> "I think that the temporary guardianship would be easier for our client to accept and consent to if there were a joint temporary guardianship with Ms. Morrissey and Mr. Muster under those circumstances. And Mr. Muster has indicated that he would defer to Ms. Morrissey on all matters of the person with respect to that. And they could deal with—deal with that as a joint capacity. Our client—certainly, if Mr. Muster and Ms. Morrissey, together, given the relationship that has developed, were indicated to be the joint temporary guardians, our client would consent to that arrangement."

The court then heard from the special interim guardian and petitioner's attorney.

Clearly pleased with the improvements to Dr. Dworecki's life, the court was determined to continue and build on that progress by transitioning what had been a special interim guardianship into a long-term guardianship. It expressed the belief that calling the guardianship "temporary" was a label it would employ to satisfy Dr. Dworecki's concerns. However, because the court concluded that Muster was precluded by a conflict of interest from serving as a co-equal guardian—because he was named the executor and residuary beneficiary of Dr. Dworecki's will—the court decided that Morrissey should continue as the full guardian of Dr. Dworecki's person and property, with Muster serving as nominal co-guardian of her property, *limited to the payment of her day-to-day expenses.* The court then announced that it would make an adjudication that Dr. Dworecki was a "person in need of a guardian"— implying that this is a condition less severe than the statute's contemplated determination that the subject is an incapacitated person. It even affirmatively asserted that there is no need for a full hearing if it merely determines that the AIP's "needs are such that she is a person in need of a guardian," rather than determining that she is incapacitated.

The court directed counsel to consult with their client and respond by email regarding whether the court needed to term the guardianship "temporary" to satisfy her concerns. It concurred with the suggestion of the special interim guardian that Dr. Dworecki not be informed of the expenditures *of her own funds* for the services being provided to her, as well as the payment of attorney's and other fees incurred in this proceeding; it reasoned that she needed the services but the expense would just upset her.

On January 30, 2013, without having received any proposals as contemplated to work out the details of the parties' concerns and to ensure Dr. Dworecki's consent, the court issued an order in accordance with the intentions it expressed at the January 16, 2013 court appearance. Its order put in place a "temporary" guardianship for a period of five years, with Morrissey serving as guardian with the broad powers requested in the initial petition, including the right to exclude visitors, and limiting Muster's position to nominal co-guardian of the property whose powers were limited to preparing checks for signature to pay fixed monthly bills such as rent, cable and telephone. It concluded with a direction to settle a final order. Morrissey served a proposed order and judgment with a settlement date of March 13, 2013.

The Events Resulting in the Sanctions Order

Whether prompted by a change of heart on the part of Dr. Dworecki, a belated realization by Donald Citak of the full extent of the guardianship the court intended, or some other impetus, the Citak firm then brought an order to show cause dated March 11, 2013 with a temporary restraining order to stay entry of any order appointing a guardian, and to instead schedule an article 81 hearing regarding Dr. Dworecki's competency and capacity. Donald Citak submitted an affirmation in which he asserted that

> "at no time, did Dr. Dworecki's [sic] consent to what was happening to her, nor did she in any way waive her right to consent to the imposition of a Guardian. This Court appears to have completely ignored Dr. Dworecki's wishes and appears ready to run completely roughshod over them and her rights."

Importantly, Donald Citak further stated that

> "[a]ny consent that was purportedly given on behalf of Dr. Dworecki to any form of continued interven-

tion of any kind was only predicated on the understanding that not merely would her relationship with Mr. Muster . . . continue as it had been over the past twenty (20) years, including he would serve as her financial advisor and manager of her assets, but that he would be appointed her Guardian without limitation."

Additionally, Donald Citak protested that "[t]here was never any consent given by Dr. Dworecki that Ms. Morrissey be appointed as a Guardian with virtual unlimited and unrestricted powers to take over and control all aspects of Dr. Dworecki's life." Donald Citak therefore insisted on Dr. Dworecki's right to a full hearing and finding of incapacity before any such guardianship be imposed.

He also criticized the court with the following observations:

"This Court seems intent on substituting its beliefs on how Dr. Dworecki should be taken care [of], how she should spend money, who should spend her money, who she should spend time with, who she should talk to, how she should spend her days, what activities she should participate in, and who should manage/control her money. The Court seems to have completely disregarded what Dr. Dworecki herself believes or feels, without any proof or evidence that such drastic intervention into Dr. Dworecki's life is warranted or necessary, either with respect to her personal home care needs or the management of her financial affairs, and without exploring the least intrusive form to provide Dr. Dworecki with whatever assistance it perceives she needs."

Also appended to the order to show cause was Dr. Dworecki's affidavit, in which she acknowledged that she had previously consented to the appointment of a guardian to assist her "in certain limited personal aspects" of her life, but only if the court found it to be "absolutely necessary" and on the condition that Muster be appointed co-guardian. She acknowledged that she required assistance with dressing, bathing, preparing meals, and cleaning her apartment, but "strenuously object[ed] and [did] not consent to the appointment of a Guardian of [her] Person and of [her] Property," and asserted that she did not need aides in her apartment "guarding over [her] like a hawk" and "babysitt[ing her] throughout the entire day."

During discussions held on the record on March 11, 2013, the court, speaking to Donald Citak, expressed its indignation at his statements:

> "I'm quite surprised that [your motion] seems to be worded and argued as if there [was] no participation whatsoever by you and your father [Burton Citak], who were present on each of the prior two court appearances at which we discussed Dr. Dworecki's situation, her need for a guardian and at which a guardian was appointed on consent with the full representation of her by you and the other Mr. Citak, Burton Citak."

The court noted that the order to show cause was "premised on the fact that this [guardianship] was somehow shoved down [Dr. Dworecki's] throat with a waiver of her appearance, without her needing it, without her wanting it and apparently without her attorneys consenting on her behalf to it." The court explained that the guardianship had been made temporary in response to Dr. Dworecki's concerns about being labeled "incapacitated" and needing assistance for the rest of her life. After reviewing the record to emphasize how all of the services that she was receiving under the guardianship had resulted in significant improvements to her health, happiness and quality of life, the court admonished Donald Citak for "condemning everything that happened here and Ms. Morrissey and the person in need of a guardian adjudication for which you participated in and to which you consented."

The court scheduled a guardianship hearing for April 30, 2013. Prior to the scheduled hearing, on April 11, 2013, petitioner moved to remove the Citak firm as counsel to Dr. Dworecki, based on their alleged conflict of interest in representing Dr. Dworecki; their alleged unfamiliarity with article 81 law; their purportedly frivolous and untrue allegations against petitioner; their purportedly unethical behavior toward Dr. Dworecki and other interested parties which bordered on malpractice; and an alleged general lack of courtesy. In this regard, the majority's reference to "questions . . . raised" as to whether the Citaks were at times acting to protect Muster's interests rather than Dr. Dworecki's merely repeats, uncritically, unsupported speculation in petitioner's papers.

On or about April 16, 2013, Dr. Dworecki brought an order to show cause to dismiss the petition based on the alleged violation of her rights; in the alternative, it sought, inter alia, the

court's recusal, various forms of injunctive relief and an adjournment of the article 81 hearing. In his lengthy affirmation in support, Donald Citak characterized the concealment of guardianship expenses from Dr. Dworecki and the suggestion that someone else is paying for the services being provided as deceit which "constitutes a fraud being practiced upon her— something that this Court should never countenance much less participate in!" The court declined to sign this order to show cause.

The court did not hold the scheduled April 30, 2013 hearing regarding either Dr. Dworecki's competence or her consent. Rather, it issued an order finding Dr. Dworecki's order to show cause of March 11, 2013, and the subsequent order to show cause that the court declined to sign, to be frivolous under 22 NYCRR 130-1.1, and directed a hearing to determine the sanctions to be imposed. It then signed the settled order and judgment implementing a "temporary" five-year guardianship.

Following the April 30, 2013 order, counsel representing the Citaks with respect to sanctions informed the court that the Citaks would withdraw from further representation of Dr. Dworecki. Successor counsel for Dr. Dworecki was appointed by the court on June 3, 2013.

Hearing on Sanctions and Costs

On July 11, 2013, the court held a hearing at which it characterized the Citaks' statements in support of their orders to show cause as misrepresentations "as to whether or not they were involved in the formation of the guardianship, whether they participated voluntarily, freely and on the record with respect to the imposition of a guardianship and its terms. Whether they consented." It further commented, "It wasn't just the disrespectful tone. There were specific claims that this Court engaged in misrepresentation and fraud. That this Court ran roughshod over Dr. Dworecki's rights."

Counsel for the Citaks appeared and apologized for the tone of disrespect in their orders to show cause, particularly with respect to some of their accusations in their second set of papers, the order to show cause the court declined to sign (motion sequence 004), which they acknowledged included language that was "intemperate and inappropriate." The Citaks' counsel also acknowledged that Donald Citak erred in failing to speak up or object at the January 16, 2013 hearing, to the extent he had issues with the guardianship as expressly contemplated by the court.

The Citaks' counsel urged that the court limit sanctions to conduct in connection with motion sequence 004, and not include the March 11, 2013 motion (motion sequence 002). As to whether the Citaks' conduct was "frivolous," as defined in 22 NYCRR 130-1.1 (c), counsel argued that, despite the "inappropriate style and the disrespectful tone," there were legitimate legal arguments in their motion papers, and the Citaks had experienced confusion or misunderstanding. Further, to the extent the court was contemplating denying the Citaks all fees generated from their representation of Dr. Dworecki in this proceeding, counsel for the Citaks argued that they were at least entitled to fees for their work preceding their April 2013 filing of motion sequence 004.

Morrissey argued that the Citaks clearly consented to the guardianship at the January 16, 2013 status conference and that, since the court indicated that Morrissey should settle a proposed final order, there could be no basis for any misunderstanding on the part of the Citaks about the fact or structure of the guardianship, or that a final order would issue. She also argued that the Citaks' conduct prior to motion sequence 004 was sanctionable because "from the very beginning" their behavior was "negative toward their client [Dr. Dworecki], upsetting to their client," including asking her to sign various legal documents subsequent to the filing of the petition in this proceeding, including a will, which she purportedly did not understand or remember signing.

Petitioner argued that everything the Citaks had done from the January 16, 2013 court appearance onward was frivolous because they "did nothing except to create unnecessary litigation and unnecessary aggravation to this particular ward."

The court denied the Citaks' application to exclude motion sequence 002 from sanctions, and indicated that, with respect to both motions, sequence 002 and 004, it intended to impose sanctions and costs in amounts to be determined following the court's review of the record and of the parties' filings. The court stated that the Citaks did not take issue with the imposition of costs, including attorneys' fees.

In its order entered on July 30, 2013, the court reiterated its earlier determination that the Citaks' motion filings were "replete with misrepresentations, omissions, distortions, and statements taken out of context" and that the Citaks, in their papers, had made "attacks on this court, its appointees, and petitioner and its counsel [that are] wholly without merit and

made in utter bad faith," and that constitute frivolous conduct. The court rejected the Citaks' assertion that they were merely acting in good faith on behalf of their client, particularly noting Morrissey's testimony that the Citaks had alarmed and distressed Dr. Dworecki, and that their conduct had necessitated additional guardianship services. The court determined that the Citaks' frivolous conduct warranted the imposition of both sanctions and costs, including attorneys' fees, the latter to be paid by the Citaks to petitioner's counsel, Dr. Dworecki's guardian, Dr. Dworecki's new counsel, and the court evaluator.

Specifically, the court ordered that Burton and Donald Citak should each deposit $7,500 with the Lawyers' Fund for Client Protection as well as:

- $6,399.18 to petitioner's counsel, Jill Sherman, for attorneys' fees;

- $12,314 to Dr. Dworecki's guardian, Sabrina Morrissey, for extraordinary guardianship services and fees;

- $6,240 to Dr. Dworecki's new counsel, Ann Pinciss Berman, for attorneys' fees; and

- $687.50 to the Court Evaluator, Matthew Milford, for additional court evaluator services.

All told, the fees and costs assessed against the Citaks totaled $40,640.68. That, of course, would not include the expenses of taking this appeal and of having private counsel representation on the sanctions hearing.

Finally, the court denied the Citaks' application for legal fees in this matter, including fees incurred for services rendered prior to the alleged sanctionable conduct.

Discussion—The Guardianship Order

To an individual suffering from the normal incidents of aging, the prospect of having a guardian appointed is daunting: By definition, a guardianship interferes with its subject's independence and self-determination; it deprives the ward of the right to make many types of decisions that adults in our society normally have the right to make for themselves (*see* Joseph A. Rosenberg, *Poverty, Guardianship, and the Vulnerable Elderly: Human Narrative and Statistical Patterns in a Snapshot of Adult Guardianship Cases in New York City*, 16 Geo J on Poverty L & Pol'y 315, 324 [Spring 2009]). That is why, in enacting Mental Hygiene Law article 81, the legislature

was particularly concerned with protecting the due process and civil rights of the proposed ward, commonly termed the Alleged Incapacitated Person (AIP).

Article 81 supplies a myriad of safeguards, including the appointment of a court evaluator, the requirement of a hearing, the "clear and convincing" standard of proof for a finding of incapacity, and, importantly, the requirement that the AIP be present (with a few narrowly-defined exceptions) for the proceedings resulting in such a determination (*see* Mental Hygiene Law §§ 81.01, 81.02; *Matter of Rhodanna C.B. [Pamela B.]*, 36 AD3d 106 [2d Dept 2006]).

Also among those safeguards is the requirement that a guardianship be "tailored to the individual needs of that person, which takes in account the personal wishes, preferences and desires of the person, and which affords the person the greatest amount of independence and self-determination and participation in all the decisions affecting such person's life" (Mental Hygiene Law § 81.01). Furthermore, courts are directed to investigate alternatives that do not necessitate a guardianship: "[g]uardianship is the alternative of last resort so other alternatives should be explored before a guardian is appointed" (Rose Mary Bailly, Practice Commentaries, McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.02 at 27). So, for instance, in a recent case where the AIP was found unable to manage her personal and financial affairs, but had home heath aides, was visited biweekly by a nurse, and had one son managing her finances and another son arranging for her medical care, the court denied the guardianship petition brought by the AIP's daughters, observing that a guardianship was not the least restrictive form of intervention available in that situation (*see Matter of Bodek*, NYLJ 1202725719135, *5 [Sup Ct, Kings County 2015, Pesce, J.]).

A guardian may be appointed if the appointment is necessary to provide for the personal needs and/or to manage the financial affairs of that person, *and the person either agrees to the appointment or is determined to be incapacitated* (Mental Hygiene Law § 81.02 [a]). Of particular importance to this case, a hearing is required *whether the AIP agrees to the appointment or is determined by the court to be incapacitated*: "A determination that the appointment of a guardian is necessary for a person alleged to be incapacitated shall be made *only after a hearing*" (Mental Hygiene Law § 81.11 [a] [emphasis added]). "Article 81 requires that a hearing be held *in all cases,*

*including a case where the person agrees to the appointment"* (Rose Mary Bailly, Practice Commentaries, McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.02 at 32 [emphasis added]). "Holding a hearing when the person agrees to the appointment provides the court with the opportunity to, among other things, assess the nature of the person's agreement and make findings regarding the powers to be granted to the guardian" (*id.*).

The majority emphasizes that "the paramount concern is the best interest of Dr. Dworecki" and that "the court's role is to consider whether she is likely to suffer harm because she is unable to provide for her personal needs and manage her property and whether she adequately understands and appreciates the nature and consequences of her limited abilities." It implies that Supreme Court's conduct here comported with those standards. However, it bears emphasis that these are fact issues, that can only be properly addressed upon an evidentiary showing. Of course, here, there was *no* evidentiary showing of incapacity, no hearing and no inquiry of the AIP. The court relied on the conclusion that Dr. Dworecki had agreed to the appointment, based on what the attorney said and failed to say. It then imposed an exceedingly broad guardianship which neither took into account the wishes and preferences of Dr. Dworecki, nor considered the issue of whether there was a less restrictive alternative which could provide her with the needed assistance. Notably, while the majority adopts Supreme Court's misnomer that the imposed guardianship is "temporary," a five-year guardianship is nothing but permanent when the subject of it is 94 years old. The resulting guardianship was improper for a number of reasons.

Failure to Hold a Hearing and Obtain the AIP's Consent

Most importantly, it was imperative, and required by statute, for the court to arrange for the AIP's appearance to conduct an inquiry to ensure the AIP's consent, not only to the fact of a guardianship, but to the form of order the court envisioned. The court's eagerness to reach a disposition that it believed to be in the AIP's best interest prompted it to cut corners, using the AIP's absence to avoid the due process protections of article 81, turning a status conference into a dispositional proceeding and dispensing with the need for testimonial evidence, the AIP's presence, or the AIP's unequivocal consent. The court's failure to comply with the statute's mandates led directly to every problem that ensued.

Even if counsel had unequivocally and affirmatively stated that the AIP consented to the guardianship in the form the court proposed, the court would not have been entitled to rely on a representation by counsel indicating the AIP's consent. Although in most litigation, "a stipulation of settlement made by counsel in open court may bind his or her client even where it exceeds his or her actual authority" (*Katzen v Twin Pines Fuel Corp.*, 16 AD3d 133, 134 [1st Dept 2005] [emphasis omitted]), that is *not* the rule in the context of a guardianship. In order to obtain the consent necessary to avoid the need of an affirmative adjudication of incapacity before instituting a guardianship, the court must inquire of the client herself to ensure that she agrees to the guardianship and its terms. This, the court failed to do, relying instead on counsel's presumed consent on behalf of his client.

The majority agrees that the court may not impose a guardianship even if counsel unequivocally expresses consent on behalf of the AIP, because the court has the obligation to first determine whether the AIP has the capacity to consent, and then to make a finding that the AIP consents. However, the majority, like Supreme Court here, does not agree with the black letter law of article 81 that even where the AIP is said to consent to a guardianship, a hearing is required in order to determine the nature and extent of the type of guardianship to which the AIP is willing to agree. But, what the law requires in this regard is no more a debatable point than the principle that an attorney for a criminal defendant may not allocute to a plea in place of the defendant, on the attorney's word alone. A guardianship may not be ordered based on counsel's consent on behalf of the client—even if that consent appears to be unequivocal, unlike Donald Citak's consent here. The client must be present to consent to both the creation of the guardianship and the nature and extent of it.

The majority also seems to conclude that the court's error in failing to undertake the requisite corrective procedures in response to counsel's March 11, 2013 motion was due to counsel's failure to correctly frame the issue of the lack of the AIP's consent in that motion. It remarks that counsel merely protested in that motion that he had not consented to the appointment of a guardian, but failed to assert that the court had erred in accepting his consent on behalf of Dr. Dworecki rather than confirming it with her. The majority seems to imply that by failing to raise the correct issue, counsel failed to properly

give the court the opportunity to revisit its flawed guardianship order. This is specious. First of all, in addition to asserting that he did not consent on behalf of Dr. Dworecki to the appointment of a guardian and that Dr. Dworecki had specific limitations to her consent, his affirmation asserted that "at no time, did Dr. Dworecki[ ] consent to what was happening to her, nor did she in any way waive her right to consent to the imposition of a Guardian." In any event, once the protest was made, even if inexactly, it was the court's responsibility to reexamine and correct the flawed procedure it had employed. What counsel said was certainly sufficient to present the issue for the court to reconsider the issue of consent.

Use of Alternative Procedure and Form of Guardianship

In establishing a guardianship without a hearing, the court explained its view that adjudicating Dr. Dworecki to be "a person in need of a guardian" rather than determining that she is "incapacitated" obviated any need for a full hearing. In other words, the court created an alternate procedure absent from the provisions of article 81, under which the formalities and protections of article 81 were inapplicable. This was wrong.

Article 81 does not authorize any such modified adjudication of the type contemplated by the court. Mental Hygiene Law § 81.16 provides for three alternatives: dismissal, appointment of a guardian, and a third alternative, for circumstances in which the AIP *is found to be incapacitated* but the court finds it appropriate, instead of appointing a guardian, to provide for some other more limited arrangement, including the appointment of a "special guardian." Under section 81.16 (b),

> "If the person alleged to be incapacitated is found to be incapacitated, . . . [t]he court may appoint a special guardian to assist in the accomplishment of any protective arrangement or other transaction authorized under this subdivision. The special guardian shall have the authority conferred by the order of appointment, shall report to the court on all matters done pursuant to the order of appointment and shall serve until discharged by order of the court."

Nothing in article 81 covers, or contemplates, the appointment of a special guardian—or any other type of guardian—upon a lesser showing than that necessary for a determination of incapacity, and without a hearing.

While there is one trial court level decision in which a special guardian was appointed for a physically disabled person

despite a finding that she did not need the appointment of a guardian for her property or personal needs (*see Matter of Lambrigger*, NYLJ, May 31, 1994 at 37, col 1 [Sup Ct, Suffolk County 1994]), the authority granted to that special guardian was extremely limited to "assist[ing] [the subject] in giv[ing] effect to her own decisions" (*id.* at 37, col 2). Even assuming the order in that case was legally supportable, its drastic limits on the authority of the appointment rendered it harmless.

In sum, there is no statutory authorization for the type of alternative form of guardianship contemplated by the court, for those who have neither been found incapacitated nor have personally, unequivocally consented to the guardianship and its terms.[3] Yet, both Supreme Court and the majority here suggest otherwise. Supreme Court assumed that it had the authority to make the more circumscribed finding that the AIP was a "person in need of a guardian" and subject her to a guardianship order, without either making a finding of incapacity based on admissible evidentiary support, or ensuring the subject's personal consent to the adjudication or the order. The majority here, although it agrees that a court may not rely on counsel's representation of consent in the AIP's absence, nevertheless implicitly approves both the adjudication of the AIP here as a "person in need," made "on consent," and Supreme Court's failure to reconsider the consent issue, and hold a hearing, upon receipt of a motion in which the AIP denied consenting.

Finding of Consent Despite Failure to Meet Expressed Conditions.

Not only did Supreme Court grievously err in failing to hold a hearing and ensure the AIP's personal consent before entering a guardianship order "on consent," but even if counsel could consent to a guardianship on behalf of the AIP, it was improper for the court to find that the AIP was consenting based on the statements and assertions counsel made and failed to make at the January 16, 2013 court appearance.

Donald Citak was attempting to be conciliatory and find a compromise, in the interest of avoiding the necessity of a formal hearing and the possibility of a finding of incapacity. Neverthe-

---

**3.** The majority's footnote 3 cites Mental Hygiene Law § 81.23 (a), a statutory provision which allows for a short-term guardianship prior to a hearing where there is a showing of a threat to the health and well-being of the AIP's person and property in the reasonably foreseeable future. Notably, that provision does not authorize the imposition of a five-year guardianship in the absence of a hearing or consent.

less, he expressed that his client had preconditions to any consent. He asserted more than once that a critical component of any guardianship to which Dr. Dworecki could agree was the inclusion of Edward Muster as a *coequal* co-guardian. It was known to all that Muster's marginalization would be a deal-breaker to which Dr. Dworecki would not consent.

The court should have recognized that to the extent counsel believed he could convey his client's consent to a guardianship even in his client's absence, counsel's conveyed consent was expressly conditional on the determination comporting with the client's demands. By failing to include the expressed precondition in the order, the court improperly treated these expressions of a condition as mere preferences that it had the option to disregard. As a result, its order cannot properly be said to have been on consent expressed by counsel.

The majority here treats counsel's acquiescence at the court's wrap-up, without protesting the court's assertions as to what it intended to do, as the equivalent of a representation that his client would consent to the court's terms. But, since those terms included provisions that Dr. Dworecki had already plainly rejected, it was unjustifiable for Supreme Court to rely on counsel's silence as enforceable consent to the order on behalf of the client. It knew the attorney did not have the authority to consent to the terms the court imposed, since counsel made the court aware of his limited authority (even assuming such authority was permissible). When an expressed condition to the client's consent was not met, counsel could not consent on her behalf, either explicitly or by his silence.

Counsel's statements relied on by the court as waiving a hearing are better understood as expressions of hope that they would arrive at a form of guardianship similar to the interim guardianship, to which they believed their client would agree.

When the court announced that it was making—or intended to make—an adjudication that Dr. Dworecki was a person in need of a guardian, without the benefit of a full article 81 hearing or an adjudication of incapacity, it also made references to follow-up conversations to be held before a final order was issued. These references support a belief on counsel's part that the court was making suggestions at that point, and that their client would have further input with respect to the terms of the final order. This may explain why Donald Citak did not object to the court's announcement of its intended resolution of the proceeding. Counsel's belief that their client's further input

would be welcome is supported by the statement in Burton Citak's affirmation of legal services dated February 8, 2013, in which he said, "We are continuing to work with the Court and Ms. Morrissey to craft a fair and limited Final Order, which provides for the assistance needed by Dr. Dworecki, while preserving and safeguarding her independence and self-dignity."

Absence of Grounds to Reject the AIP's Desired Terms

Furthermore, the court was wrong to reject Dr. Dworecki's expressed preconditions to her consent. The court lacked valid grounds to reject Muster as a coequal guardian. "[I]t has long been held that strangers will not be appointed [guardian] of the person or property of the incompetent, unless it is impossible to find within the family circle, or their nominees, one who is qualified to serve" (*Matter of Gustafson*, 308 AD2d 305, 307 [1st Dept 2003] [internal quotation marks and citations omitted]). While Muster may not have been a blood relative, he was the equivalent of one to Dr. Dworecki, and he was in any case her nominee. It was Dr. Dworecki's statutory right to request a particular guardian (*see* Mental Hygiene Law § 81.17) and the court was obligated to appoint her nominee unless it found him to be unfit (*see* Law Rev Commn Comments, reprinted in McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.17 at 205; *Gustafson*, 308 AD2d at 307-308; *Matter of Kathleen FF.*, 6 AD3d 1035 [3d Dept 2004]).

The court's assessment that Muster suffered from a conflict of interest was wrong. He was Dr. Dworecki's most trusted helper for over 20 years, and had never done anything to create any cause to doubt his trustworthiness. His position as her executor and her residuary beneficiary under her will was a reflection of their close relationship, which was virtually the equivalent of parent and child. He took care of her finances with no compensation both before and after she named him in her will; he sought no compensation as a co-guardian. Children and close relatives of AIPs are often in the equivalent position, yet they nevertheless frequently serve as their parents' guardian (*see e.g. Kathleen FF.* at 1037).

The majority's speculation that something must have been amiss because Dr. Dworecki's power of attorney and will were not executed until she was in her 90s amounts to just that— speculation; Muster had not just arrived on the scene, but had been Dr. Dworecki's friend for more than 20 years. There are no allegations, much less proof, of duress, testamentary

incapacity or any other circumstances that would invalidate Dr. Dworecki's legal expressions of her wishes.

The majority further surmises that Muster was hesitant to spend any of Dr. Dworecki's funds for her personal care because he feared offending her sense of frugality, with the possible result that she might revoke her will at the expense of his status as residuary beneficiary. Nothing in the record supports this speculation. Nor, contrary to the majority's assertion, is it "clear" that Muster's desire to continue his firm's successful management of Dr. Dworecki's assets somehow tainted his relationship with her or motivated his opposition to the court's approach.

Of course, if there is some basis in fact for finding that an AIP's relative or nominee might be inclined to avoid making expenditures on the parent so as to protect his or her own expected inheritance, such a showing could support placing limitations on that individual's authority, perhaps by putting a co-guardian in place. But, absent such a showing, such an appointment of a child or close relative would not be questioned despite their position as beneficiary. As this Court explained in *Matter of Robinson (Schlein)* (272 AD2d 176, 176 [1st Dept 2000]),

> "Given the safeguards of article 81 of the Mental Hygiene Law and absent any evidence that the proposed family members had failed to properly care for the incapacitated person or that there was any conflict of interest, it was an abuse of the court's discretion to appoint the court evaluator instead of petitioners as the property management guardian for their incapacitated father."

Even if there is a legitimate need for a co-guardian to protect against any possibility of impropriety by the AIP's preferred relative or nominee, once such a co-guardian is appointed, there should be no need to limit the AIP's preferred relative or nominee to a marginal role. Similarly, there was no valid rationale to marginalize Muster's role here. Having appointed a co-guardian as a safeguard, the court here certainly lacked any justification for limiting Muster's participating to check writing for Dr. Dworecki's standard monthly bills, in the face of Dr. Dworecki's expressed desire that he be made a co-equal guardian, and the complete absence of any evidence that he was motivated by self-interest rather than concern for Dr. Dworecki.

The court also went so far as to stay, without legal authorization, the power of attorney that Dr. Dworecki had granted Muster. Mental Hygiene Law § 81.29 (d), the purported authority for the court's order, provides that a court has discretion ("may") to "revoke" a power of attorney "[i]f the court determines that the person is incapacitated and appoints a guardian," but here there was neither a finding of incapacity nor a formal guardianship within the meaning of article 81. Moreover, even if the court had discretion to stay the power of attorney in this case because the two conditions had been met, I submit that there was no evidentiary support of any grounds for revocation of the power of attorney.

My colleague, Justice Kapnick, has filed a concurring opinion solely in order to "disagree with [Justice Andrias's] criticism and distrust of Mr. Muster and concern about Mr. Muster's impartiality and/or conflict of interest in this proceeding."[4] In so doing, she seems to recognize that there was no basis for an attack on Muster's motives or interests, and to implicitly agree with my assessment of Muster as Dr. Dworecki's well-intentioned friend and helper who had acted selflessly, in accordance with Dr. Dworecki's interests. Given her expressed view, I fail to understand her unwillingness to acknowledge the clear corollaries to her statement: (1) that Muster is Dr. Dworecki's legitimate nominee, who, at the very least, should have been appointed to a true guardianship position, not merely to a nominal, check-writing position, and (2) that there was no proper basis to vacate the power of attorney Dr. Dworecki bestowed on Muster before this proceeding began. In effect, Justice Kapnick is using the vehicle of a concurring opinion in order to make the empty gesture of rehabilitating Muster's reputation after it was sullied by both Supreme Court and the majority here, while remaining unconcerned about the court's practical use of its accusations impugning Muster, as part of the justification for its sweeping violations of Dr. Dworecki's rights under the Mental Hygiene Law, and the resulting improper imposition of monetary sanctions on counsel.

---

4. Another concurring colleague, Justice Tom, also asserts that there is no record support for the suggestion that Muster acted improperly; he even suggests that Mr. Muster's due process rights were violated when the court refused to appoint him as a true co-guardian. Like Justice Kapnick, however, he, too, fails to perceive how that error contributed to the series of errors and injustices that led to the issuance of the order on appeal. While Justice Tom does not limit himself to that point as Justice Kapnick does, the two concurring writings are both lacking in value.

The court's failure to incorporate Dr. Dworecki's expressed preconditions into the guardianship is not cured by its inclusion of the label "temporary" at counsel's suggestion. Any suggestion that the court was being accommodating by terming the guardianship "temporary," fails to recognize that in order to issue a guardianship order on consent, the AIP must consent to its terms; adopting one single small suggestion by Dr. Dworecki's attorney does not cure that failure.

I recognize that the court had before it evidence that Dr. Dworecki had been unable to meet many of her personal care needs, and that her life could be, and was, improved by the special interim guardian's hiring of various forms of help. Nevertheless, it did not determine that Dr. Dworecki was incapacitated, nor did it ensure that she agreed to the appointment in the form and to the extent imposed by the court. Moreover, even if the court had properly found Dr. Dworecki to be incapacitated, and required services beyond those she was currently receiving, it could have put in place additional services without scrapping the arrangements she had already made, with Muster's help. Consideration of *Matter of Bodek* (NYLJ 1202725719135 [Sup Ct, Kings County 2015], *supra*) helps illustrate how, even where it is has been properly determined that the AIP is incapacitated, the requirement that the court impose the least restrictive alternative may make it preferable to begin with the arrangements already in place, and build upon them as necessary.

In imposing on Dr. Dworecki what it believed was in her best interests, putting in place a guardianship having far more power over her life than she either wanted or agreed to, and by doing so without a hearing, the court did exactly what article 81 was crafted to prevent; it deprived Dr. Dworecki of all rights to self-determination without first ensuring that the proper predicate for doing so was established. It thereby justified the concerns Dr. Dworecki expressed in first opposing the petition:

> "My life has severely been interrupted by the filing of the Petition herein, which I believe is completely unwarranted. Such intrusion by the government is totally without basis and reminds me of what occurred to me 75 years ago when the Nazi regime came in and took away our possessions and tried to destroy our lives solely because we were Jewish."

Not only did the court intrude into her life far beyond her expressed consent, and destroy her right to self-determination,

without the due process protections especially provided for by statute. It also contravened the overarching policy of article 81 requiring imposition of the least restrictive form of intervention; it utterly failed to tailor the guardianship to Dr. Dworecki's wishes and preferences, or to afford her any independence.

The imposition of a guardianship was therefore wrong in many respects. Notably, it is irrevelant that Dr. Dworecki's new attorney, who was hand picked by the court, represented at the sanction hearing that her client "had no desire to appeal," although that assertion is emphasized by the majority as if it justifies the guardianship order. Even if we could accept this hearsay report as accurate, it does not retrospectively render the adjudication proper.

A guardianship is a legal proceeding circumscribed by the due process protections of article 81 of the Mental Hygiene Law. The proceeding culminates in a determination about the condition and needs of the proposed ward at a particular point in time—a "snapshot"—and is not a "rolling" social work program intended to evaluate the proposed ward on a continuing or ongoing basis. Otherwise, the subject of such a proceeding, once ensnared in it, could be perpetually trapped at the mercy of those seeking to assert control over her, even while the required conditions for imposing any control do not exist, just because they may eventually exist.

The Sanctions Order

The imposition of sanctions, approved by the majority here as against Donald Citak, is not warranted by the statements he made in his motions. Under 22 NYCRR 130-1.1 (c), conduct is frivolous if

> "(1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law; (2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or (3) it asserts material factual statements that are false."

It is not suggested that the contents of Donald Citak's March and April 2013 motion papers were either completely without merit or undertaken to delay the proceeding. Supreme Court and the majority here focus on the reasoning that counsel made false material factual statements. They assert that counsel's

March 2013 order to show cause was frivolous because in it counsel denied or failed to acknowledge that during the January 16, 2013 appearance he made statements and other indications of consent to the imposition of a guardianship; they also treat as a sanctionable falsehood the complaint that the court "appears to have completely ignored Dr. Dworecki's wishes and appears ready to run completely roughshod over them and her rights." As to his subsequent attempted order to show cause, brought before the court in April 2013, but which the court declined to sign, it is also said to contain inaccurate, insulting or improper assertions by counsel. I strongly disagree with their assessment; none of the assertions contained in those motion papers constituted the type of false material statements of fact, or any other type of impropriety that amounts to frivolous conduct as contemplated by the rule.

By upholding the sanctions imposed on the attorneys who represented Dr. Dworecki, the majority rubber-stamps the ill-advised manner in which the court handled a valid complaint about its handling of a guardianship. It assiduously defends the ruling of our trial court colleague even though the trial court made a fundamental error in handling the proceeding, which error prompted counsel to make those motions in which he complained *on behalf of his client* about violations of her rights, and even though instead of responding to those valid complaints, the court focused its attention on punishing counsel for his perceived insults. While sympathy for our trial court colleagues is understandable, that impulse should not extend to supporting ill-conceived punitive measures that spring from resentment of legitimate complaints about judicial errors. In approving the imposition of sanctions here, the majority has extended the law of sanctions in the First Department beyond any existing precedent to the point where it will dangerously chill zealous advocacy and impair the independence of the trial bar (*see* Oscar G. Chase, *Sanctions in State Courts—Proposed Rule Needs Changes,* NYLJ, Oct. 22, 1987 at 1, col 3, at 32, col 1). It applies cases involving misconduct directly and intentionally undertaken to harass or maliciously injure, to conduct that bears no similarity to that sort of misconduct. The majority has created a new precedent that authorizes punishing attorneys for understandable, and non-malicious words and actions that were made in their efforts to protect their clients' interests. Moreover, in addition to expanding the scope of sanctionable conduct well beyond anything that previously formed the basis for sanctions, the majority also authorizes an expan-

sion of the magnitude of the allowable penalty that may be imposed, beyond currently existing case law. This sets a dangerous precedent.

The majority repeatedly asserts that Donald Citak's conduct falls within 22 NYCRR 103-1.1's definition of frivolous conduct because after he "initiated, participated in and consented on behalf of Dr. Dworecki to the procedure adopted by the court," he then "denied his role and falsely accused the court of wrongdoing and fraud."

"Misrepresentations"

It is simply wrong to refer to Donald Citak's statements on March 11, 2013 regarding what took place on January 16, 2013 as "misrepresentations" or false assertions such as would constitute frivolous conduct justifying the imposition of sanctions.

In the context of part 130, and the cases relied upon by the majority involving misrepresentations, the term has been used to refer to venal or, at least, intentional falsehoods made in bad faith. Where a sanctioning court called an attorney's misstatement "disingenuous," but it was neither intentional nor made in bad faith, this Court has reversed the imposition of a sanction (*Llantin v Doe*, 30 AD3d 292, 293 [1st Dept 2006]). If counsel made intentional misstatements in a purposeful effort to mislead the court or any other participant, sanctions for material misstatements could have been warranted (*see Matter of Matseoane*, 110 AD3d 607, 608 [1st Dept 2013], *lv dismissed* 22 NY3d 1172 [2014]). Interestingly, even intentional conduct may not be considered enough; in *DeRosa v Chase Manhattan Mtge. Corp.* (15 AD3d 249, 250 [1st Dept 2005]), while the majority sanctioned attorneys for the misleading conduct of intentionally altering the appellate caption and adding a document to the appellate record when it had not been before the trial court, the dissent in that case, written by a member of the majority in this case, expressed the view that there was no basis for the majority's sua sponte ruling that sanctions were warranted, despite the intentional and misleading conduct (*id.* at 251).

The majority reasons that Donald Citak

> "falsely asserted that he had objected on behalf of his client to the appointment of temporary coguardians and that the proposed settlement was being fraudulently forced on Dr. Dworecki by the court,

> when in fact he participated voluntarily, freely and on the record with respect to the imposition of the coguardianship and its terms, to which he did not object at the January 16, 2013 conference."

However, when we consider the totality of everything that was said in the January 16 conference, it becomes clear that Donald Citak was not intentionally lying in his March 11, 2013 affirmation, when he denied having consented to the court's proposed guardianship on January 16, 2013.

While counsel attempted to make a good faith effort to find common ground for a consent order that would obviate the need for a hearing on the issue of incapacity, he did not affirmatively "consent" to the guardianship in the form proposed by the court; at no time did he clearly assert that the terms the court proposed at the close of the conference would be acceptable to his client. On the contrary, until the end of that conference, counsel conveyed his client's position regarding the conditions under which he believed she would consent to the appointment of a guardian. Indeed, a careful reading of the transcript of that appearance reflects that where counsel used the word "consent," his understanding regarding exactly what was being consented to, and under what conditions, did not comport with what the court intended to, and did, put in place. Even if his cooperation and failure to object communicated his own consent, he certainly never unequivocally asserted that Dr. Dworecki consented to a guardianship on the terms the court proposed—or imposed—at the close of the status conference.

Donald Citak's participation and expressed desire to arrive at a consented-to resolution, and his failure to explicitly object to the court's eventual proposal, are not the equivalent of consent on behalf of his client to the guardianship as the court framed it. While he would have been well advised to pay more careful attention to the judge's proposal, and to reiterate that he needed to obtain his client's consent to the type of guardianship the court envisioned, his mistake on January 16 was in failing to accurately and fully communicate his position. Although his March 11, 2013 affirmation may be fairly said to fail to acknowledge that he seemed to accede, and did not object, to the court's proposed guardianship on January 16, 2013, the objections and denials on March 11 must be distinguished from an intentional, bad faith misrepresentation. It was arguably less than accurate, and perhaps motivated by

defensiveness, but it was not an intentional lie or made in bad faith. Moreover, the most important part of his March 11 affirmation was that his client had not consented, and that is unchallengeable.

Even assuming that Donald's statements in his March 11, 2013 motion papers had definitively denied giving his own consent to the guardianship on January 16, and that such statements were inaccurate, they were neither venal misrepresentations nor intentional attempts to mislead as to a material point. At worst, they were the equivalent to negligent misrepresentations, which have never formed the basis for the imposition of part 130 sanctions.

Critical, Intemperate or Disrespectful Language

Particular emphasis was also placed by the court on Donald Citak's statement, in his March 2013 affirmation in support of the order to show cause (motion sequence 002), that the court "appears ready to run completely roughshod" over Dr. Dworecki's wishes and rights, and of his use of the word "fraud" in his April 2013 affirmation in support of the unsigned order to show cause (motion sequence 004) to justify the award of sanctions.

Initially, no appellate authority has been found that upholds or awards sanctions for intemperate language alone, and in any event, the language employed by Dr. Dworecki's attorney constituted nothing less than zealous advocacy in a personally and tactically difficult circumstance. To the extent the majority may be trying to frame these assertions as misrepresentations, they do not fall within that category.

To "run roughshod" is a colorful but relatively innocuous way of saying that someone was ignoring another's wishes and rights ("in a roughly forceful manner" [Merriam-Webster's Collegiate Dictionary at 1085 (11th ed 2003)]). It is hardly the sort of language that warrants sanctions, even if arguendo sanctions could be imposed for language alone. To say that someone "appears ready" to run roughshod over another's wishes and rights is one step even further removed from any purported offensiveness: It frames the statement in futuro and suggests a state of affairs that may happen but has not happened yet, thereby amounting to a request that the subject not engage in certain conduct. It certainly does not smack of the type of insult or disparagement that the court took it to be.

Moreover, Donald Citak was not wrong in that characterization, or in his use of the word "fraud." His assertions in his

April 2013 order to show cause, which the court declined to sign and was therefore a legal nullity to which no party needed to respond, did indeed use the word "fraud" to describe what the proceeding and the court had done to Dr. Dworecki:

> "Dr. Dworecki has a constitutional right to know how much of her money is being spent as a result of the Orders and/or directions of this Court, what services are being procured for her, and whether she wishes to have those services. To deceive her into believing that some[one] else is paying for the services being provided to her constitutes a fraud being practiced upon her—something that this Court should never countenance much less participate in!"

However, this was neither a misrepresentation nor an incorrect description of the situation. Because the court had concurred with the suggestion of the interim special guardian that Dr. Dworecki not be informed of the expenditures *of her own funds* for the services being provided to her, reasoning that she needed the services but the expense would just upset her, it *was* countenancing a violation of Dr. Dworecki's fundamental rights. A person who has not been determined to be incapacitated has every right to know the expenditures being made from her funds by someone else. The paternalistic approach suggested by the guardian and approved by the court may have been intended as kindness, but it nevertheless amounted to a fraud upon Dr. Dworecki. Indeed, this Court has disciplined an attorney for a well-meaning misrepresentation to his client, notwithstanding the advice of the client's psychiatrist that it would be in the client's interest that the attorney do so (*see Matter of Rochlin*, 93 AD2d 683 [1st Dept 1983]); the court's approval of the guardian's expressed intent to avoid disclosing expenditures because Dr. Dworecki *might* become upset, a lay conclusion unsupported by psychiatric or other expert opinion, is no more justified when sanctioned by the court.

This authorized violation of Dr. Dworecki's fundamental rights, resulting when the court authorized keeping information from Dr. Dworecki about expenditures being made from her own funds, is not negated by the brief exchange that took place at the first conference on August 9, 2012, in which Dr. Dworecki was informed that she would be paying for the services that would be supplied to her during the "interim"

guardianship. Accordingly, counsel's language challenging the court's actions in that respect was appropriate.

Nor are sanctions justifiable based on the Citaks' concession that they had employed "intemperate language" in making their arguments. That concession was made by their counsel while the Citaks were in the difficult position of facing criticism by the court while still needing the court to rule in favor of their client's position; a deferential apology may have been their most viable option. Notably, in this same context they correctly emphasized that their legal arguments had "colorable merit."

The majority's position that Citak's language is sanctionable is not even remotely supported by any of the authorities it relies upon to justify sanctions.

In *Shields v Carbone* (99 AD3d 1100 [3d Dept 2012]), the sanctioned attorney had previously engaged in improper behavior, which the court considered in determining whether the conduct under consideration was aberrant or part of a pervasive pattern. Here, there was no such prior misbehavior; apparently, neither Citak has been previously disciplined and the record contains no inkling of prior sanctions imposed on either of them, facts particularly telling in light of the 86-year-old elder Citak's long career as a litigator.

Moreover, in *Shields*, the language found to be sanctionable accused the court of rendering decisions for political or financial reasons, willfully disobeying the law and either committing crimes or condoning their commission by other public officials, all apparently without any basis in fact. Here, however, there were no such ad hominem attacks on the court, because, as previously discussed, "fraud" was used to describe, albeit in strong language, what actually transpired in the authorized concealment of matters from Dr. Dworecki.

*Matter of Kyle v Lebovits* (17 Misc 3d 1124[A], 2007 NY Slip Op 52132[U] [Sup Ct, NY County 2007], *appeal dismissed in part* 58 AD3d 521 [1st Dept 2009], *lv dismissed in part, denied in part* 13 NY3d 765 [2009], *cert denied* 559 US 938 [2010]) is also markedly different from the instant circumstance. In that case, the lower court decision upon which the majority relies sanctioned the attorney for numerous acts of misconduct: he misrepresented the record in accusing two judges of conspiring to coerce an unfair settlement of proceedings by threatening prior counsel in the matter to bring a disciplinary complaint against him, when there was no supporting affidavit from prior

counsel and also a transcript indicating that the judge before whom the proceedings were pending clearly stated that he would not make such complaint; he deliberately misquoted transcripts several times by adding his own punctuation, and selectively truncating quotes; he made misrepresentations of law; he commenced a "baseless" article 78 proceeding against the judge; and he made a number of ad hominem attacks against the judge. Despite what the lower court referred to as "numerous" infractions, it imposed a total sanction of only $1,000. The attorney's conduct and the sanction imposed in *Kyle* are both a far cry from the conduct and sanction here. Notably, in dismissing the portion of the appeal that sought review of the sanctions order, this Court did not pass on the propriety of the sanctions.

Finally, in *Nachbaur v American Tr. Ins. Co.* (300 AD2d 74 [1st Dept 2002], *lv dismissed* 99 NY2d 576 [2003], *cert denied* 538 US 987 [2003]), there was also a multiplicity of acts of misconduct, including not only an ad hominem attack on the court, but, in addition, insults to the attorney's adversary, repetitive and meritless motions, a baseless complaint, and utterly useless motion papers. Moreover, on appeal before this Court, an additional sanction was imposed for repeating the insulting comments and ad hominem attack and for failing to cite adverse authority in which the attorney had represented the losing appellant just a short while earlier. In the face of these multiple instances of misconduct, this Court sustained the lower court sanction of only $5,000 and imposed an additional one of $5,000 for frivolous conduct on appeal, again, a scenario clearly unlike that here.

In addition to its inappropriate reliance on inapplicable sanctions cases in which the blameworthy misconduct was egregious or undertaken in bad faith, unlike Donald Citak's conduct, the majority's approval of the sanctions here is also inconsistent with a recent decision of this Court in which we declined to impose sanctions for language far more insulting to the trial court than that used by Donald Citak. In *Matter of Russo v New York City Hous. Auth.* (128 AD3d 570 [1st Dept 2015]), this Court—including one member of the majority in this case—rejected the suggestion that the appellant's counsel should be sanctioned, where the appellant's brief accused the motion court of being biased and unprofessional, including assertions that the court "shamelessly distort[ed] the administrative record and misconstru[ed] legal precedent," "blatent[ly] at-

tempt[ed] to dismantle" Housing Authority policy, and made a "results-oriented" decision according to its "agenda."[5] In other words, the appellant's counsel in *Russo* went beyond merely criticizing the justice and her rulings; counsel accused the justice of gross misconduct and improprieties.

Although the appellant in *Russo* made serious accusations against the trial court there, this Court—properly exercising our discretion—declined the respondent's suggestion that appellant's counsel be sanctioned. Part 130 sanctions have never been used to punish even ill-advised criticism of a judge except in the presence of other substantial misconduct such as the baseless pursuit of litigation (*see e.g. William P. Pahl Equip. Corp. v Kassis*, 182 AD2d 22, 32 [1st Dept 1992], *lv dismissed in part, denied in part* 80 NY2d 1005 [1992]).

The doctrine of stare decisis requires us to respect and follow precedent (*see generally Matter of Higby v Mahoney*, 48 NY2d 15 [1979]). Of course, the issue of sanctions is a broadly discretionary one, and depends heavily on the facts of each case. Nevertheless, these rulings should be constrained to some extent by past cases, and our appellate review of sanctions awards should ensure a degree of consistency and prevent

---

**5.** The appellant's brief in *Russo* included the following accusations:

"Not only does the lower court shamelessly distort the administrative record and misconstrue legal precedent, it uses this case as a platform to air its wide-ranging yet unfounded criticisms of [NYCHA] in a transparent effort to undercut [NYCHA's] rational succession policy."

"After misrepresenting the administrative hearing transcript, misconstruing the relevant case law."

"After misrepresenting the administrative hearing transcript and gratuitously maligning the performances of [NYCHA counsel] and the Hearing Officer."

"In a blatant attempt to dismantle Housing Authority's . . . policy. . . Justice Schlesinger's vociferous effort to undermine the [NYCHA's] succession policy is inappropriate."

"In one of her many mischaracterizations of this Court's holdings."

"On her results-oriented mission, Justice Schlesinger bizarrely criticizes the Hearing Officer and the Housing Authority."

"Justice Schlesinger clearly misunderstands or misrepresents . . . procedure."

"Justice Schlesinger distorts . . . with the sole purpose of disparaging [the guardian ad litem]'s performance at the hearing."

"Justice Schlesinger rationalizes . . . by conveniently claiming."

"Justice Schlesinger nonsensically posited."

"Justice Schlesinger's summary is an obvious distortion of what actually occurred during the hearing."

"Justice Schlesinger's agenda is manifested in the first sentence of the decision."

entirely subjective rulings where the harm is a perceived slight to the court. In view of the absence of applicable precedent justifying the imposition of sanctions based on intemperate language and a non-venal misstatement, along with this Court's recent denial of sanctions for accusatory and critical language against a judge (*see Russo* at 571-572), sanctions should be denied here.

In any event, intemperate or disrespectful language does not even appear to be grounds for part 130 sanctions; it is not a misrepresentation, nor is it a delaying tactic. If anything, disrespect or rudeness toward the court is closer to contempt of court under Judiciary Law § 750 (A) (1), which authorizes courts to punish for "[d]isorderly, contemptuous, or insolent behavior, . . . directly tending to . . . impair the respect due to its authority." However, even where such conduct occurs, the court must give the offender the opportunity to explain or apologize (*see Matter of Katz v Murtagh*, 28 NY2d 234 [1971]). It should go without saying that the statements complained of here do not rise to the level of contempt, and even if they did, counsel's apologies and explanations would have negated any basis for a contempt order.

The majority also argues that what it views as frivolous statements may not be excused as zealous advocacy, because they also violate provisions of the Rules of Professional Conduct (22 NYCRR 1200.0). However, even assuming that standards for attorney discipline may be used as a source for the determination of whether conduct is sanctionable pursuant to part 130, the Rules of Professional Conduct fail to provide any better support for sanctioning Donald Citak. The majority cites rule 3.1 (b) (3), which defines as "frivolous" for purposes of that rule, "knowingly assert[ing] material factual statements that are false," and rule 3.3 (a) (1), which prohibits lawyers from "mak[ing] a false statement of fact or law to a tribunal or fail-[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Our earlier discussion makes it unnecessary to discuss why Donald Citak's assertions in his March and April 2013 motion papers did not violate these rules.

The majority then cites rule 3.3 (f) (2), which prohibits lawyers appearing before tribunals from engaging in "undignified or discourteous conduct." While it may be possible to argue that Donald Citak could have phrased his challenges and complaints in a nicer and more courteous fashion, I do not

believe that the language he used to challenge the court's actions is the type of "discourteous conduct" that the rule contemplates as warranting attorney disciplinary action. The majority's characterization of his statements as "outrageous, overblown and insulting comments about the court and Ms. Morrissey" is hyperbolic.

Conduct Undertaken to Harass or Maliciously Injure Another

There is no basis for a claim that Donald Citak's conduct was frivolous in that it was undertaken to harass or maliciously injure another (*see* 22 NYCRR 130-1.1 [c] [2]). Certainly there are instances where the court can discern from the circumstances, without testimony from the attorney, that the attorney's conduct was fueled by an improper motive (*see* Oscar G. Chase, *Sanctions in State Courts—Proposed Rule Needs Changes*, NYLJ, Oct. 22, 1987 at 1, col 3), but if that is what the court concluded in this instance from the language used by counsel, then it is difficult to fathom just how that conclusion was reached properly. Although the Citaks were present in the courtroom during the sanctions hearing, they were not called upon to testify; because it was not their burden to demonstrate why sanctions should not be imposed, it was not their obligation to testify in order to attempt to show the negative—that they did *not* act with the motive of harassing or maliciously injuring the court. In any event, they did assert that they had not acted with the purpose of delaying or prolonging the resolution of the proceeding, or to harass or maliciously injure the motion court, opposing counsel or any party, and there is nothing to show this assertion to be false.

When the assertions Donald Citak made in his two motions are reviewed in their totality, it becomes apparent that he is being called to task for a basically puny constellation of rhetorical language; his words are basically the stuff of everyday lawyering. By allowing such rhetoric to be the foundation for the imposition of sanctions, we are setting a new, substantially lower standard for what circumstances warrant sanctions awards.

This sanction order is also ill-advised as a matter of policy. Mental Hygiene Law article 81 proceedings are heavily laden with ethical minefields for counsel for the AIP. How to navigate those minefields is especially difficult when the judge is determined to leave an imprint on the AIP's life, while the AIP herself, accustomed to years of independence, wants to remain independent or to abandon that independence only on her own

terms. Lawyers who might otherwise be willing to represent AIPs might think twice after reading the majority's decision, essentially holding them financially accountable when their client, the AIP, has refused to be pushed any more.

The impropriety of the imposition of sanctions in this case necessarily encompasses the award of costs and attorneys' fees as well.

Additionally, as to motion sequence 004, even if it could correctly be characterized as frivolous due to its language or even its merit, since the court declined to sign it, it amounted to a nullity devoid of any jural effect on the adjudication of the guardianship proceeding. Because no other party had to respond to it, I fail to see how any award of attorneys' fees to the other attorneys would be appropriate or necessary for any such intemperate language in those motion papers. Nor should attorneys' fees be awarded for appearances at an unnecessary, unwarranted sanction hearing.

Conclusion

Litigation is often heated and contentious. Some judges get so deeply invested in the promotion of a settlement that when it falls through, there is a tendency, as here, to focus the court's displeasure at the lawyer or party the judge holds responsible for this failure. Judges must quickly get past this reaction, and resign themselves to the necessity of conducting a trial, even where it seems obvious that settlement might be the better course. Supreme Court here allowed such an immediate offended reaction to take control of the litigation that followed.

The stakes here were high—the personal freedom and the economic freedom of an elderly survivor of Nazi Germany. Dr. Dworecki zealously guarded those freedoms and she instructed her lawyers to do the same. While her attorneys recognized that some of the services being supplied to Dr. Dworecki during the "temporary" guardianship were of assistance to her, and acknowledged that fact to the court, they knew that their client had uncompromising conditions before she consented to any permanent guardianship. And so did the court.

Whether the Citaks only became fully aware of the extent of the court's plan for a full-fledged article 81 guardianship upon receipt of the proposed order noticed for settlement on March 13, 2013, at which time they reported that information back to their client, or whether Dr. Dworecki's responses vacillated, she must have expressed displeasure and, perhaps, agitation,

when they discussed the proposed order with her. In preparing the responsive papers that were presented to the court, that displeasure was communicated in strong direct language. Arguably, the Citaks made some inadvisable steps, both in failing to protest the court's final assessment on January 16, 2013 and in the phrasing of the motions that followed. However, even words or actions that are inadvisable do not form a proper basis for the imposition of sanctions because they do not constitute frivolous conduct. It bears repeating that permitting misstatements such as these to become the predicate for sanctions unreasonably expands the law as it currently exists, that until now has labeled "sanctionable" only conduct far more egregious than here, and will have a chilling effect on advocacy in the trial courts.

By treating Donald Citak's language as a sign of disrespect, rather than the strong words of a lawyer trying to protect his client's interests in a difficult situation while simultaneously protecting himself against criticism, the court veered off course with this unnecessary satellite sanction and costs proceeding. The issues could have and should have instead been resolved, simply, with the court frankly expressing its grievance, followed by the lawyers' apology for their choice of language, and the scheduling of a hearing to determine either whether Dr. Dworecki was incapacitated or whether she consented to a full-fledged guardianship notwithstanding her earlier clear opposition.

Because it was Justice Visitacion-Lewis's disregard of not only the sensitive issues presented in this matter, but also the legal requirements of article 81, that led directly to this unnecessary award of sanctions, and because she has expressed anger, resentment and petulance toward Donald Citak personally, the hearing now directed by the majority should be reassigned to a different judge.

Manzanet-Daniels and Kapnick, JJ., concur with Andrias, J.; Tom, J.P., concurs in a separate opinion; Kapnick, J., concurs in a separate opinion; Saxe, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on or about May 1, 2013, and order, same court and Justice, entered July 30, 2013, modified, on the law, the facts, and in the exercise of discretion, to vacate the award of $7,500 sanctions against Burton Citak, Esq., to vacate the award of attorney's fees, costs for extraordinary guardianship services, and additional court

evaluator services, and to remand for compliance with 22 NYCRR 130-1.2, and to vacate the denial of Citak & Citak's request for attorney's fees and to remand for a determination of the reasonable fees owed Citak & Citak by its client, and otherwise affirmed, without costs.